DECISION AND JUDGMENT ENTRY
{¶ 1} John Smith appeals his convictions for felonious assault and involuntary manslaughter stemming from his assault of Bryan Biser, who died after being hit by a single punch to the head. Biser was diabetic and quit taking his medication after the incident. Prior to death, his blood sugar levels were extremely elevated and his bowels had become necrotic. Thus, Smith contends unforeseeable intervening events caused Biser's death. However, based on the testimony from the State's two expert witnesses, a reasonable juror could conclude that Smith's punch and Biser's resulting fall damaged the frontal lobes of Biser's brain. As a normal result of these injuries, Biser became apathetic and disinterested, which in turn, led to his failure to take required medication, and ultimately his death. Biser's lapse in attending to his own care was a response to *Page 2 
Smith's assault. Because it was neither unforeseeable nor abnormal, it cannot be an intervening cause that broke the chain of legal causation stemming from the assault.
 {¶ 2} Second, Smith contends that the jury's verdict is against the manifest weight of the evidence. Relying on the same evidence noted in the first assignment of error, and considering the credibility of the State's witnesses, we conclude that the State has presented substantial evidence upon which the jury could have reasonably concluded, beyond a reasonable doubt, that Smith's punch to Biser's head proximately caused Biser's death.
 {¶ 3} Third, Smith contends that the trial court imposed restitution upon him without first considering his ability to pay, in violation of R.C. 2929.19(B)(6). However, the trial court indicated in the transcript that it would consider Smith's PSI and victim impact statements before imposing restitution. Because these documents contained financial information relating to Smith and the victim's injuries, we overrule Smith's third assignment of error.
 I. Facts {¶ 4} A grand jury indicted John Smith with one count of felonious assault and one count of involuntary manslaughter for allegedly causing the death of Bryan Biser by a closed-fist punch to the head. The case proceeded to a jury trial, which produced the following facts.
 {¶ 5} On April 15, 2005, Bryan Biser spent the afternoon socializing with neighbors at the Hokolesqua Apartments just outside Frankfort, Ohio. Biser sat outside with his neighbor, Shanna Knapp, and split a six-pack of beer with her *Page 3 
while watching the children playing in a playground just across the parking lot. As they watched the children, two of the kids around the age of five got into a fight. One of the children was a distant relative of Smith's.
 {¶ 6} When Smith learned that his nephew's child had been in a fight, he walked over to the playground and screamed obscenities at the children. Smith encouraged his five-year-old relative to beat up the other child. Ms. Knapp overheard Smith and approached him near the playground. Ms. Knapp told Smith to stop yelling obscenities and encouraging the children to fight. Ms. Knapp then got into an argument with Smith's nephew, John Rawlings.
 {¶ 7} Biser approached Ms. Knapp and Rawlings in the parking lot and attempted to stop the arguing by asking everyone to calm down. Smith then walked around a car towards Biser, yelled an obscenity at him, and hit him with a closed fist on the left side of his head while Biser stood with one hand to his side and one hand holding a beverage cup. Biser never raised his arms, squared to fight, or said a threatening word.
 {¶ 8} As Biser crumpled to the ground, the right side of his face hit a parked car, and then his head hit the pavement. Smith "danced" over Biser, as he lay unconscious, taunting him to get up and fight and challenging everyone else to fight him. Biser remained on the ground while a neighbor, Twila Jones, called 911. One of the children alerted Amy Preston, the apartment complex manager, who was also a nursing assistant, to attend to Biser.
 {¶ 9} Approximately fifteen minutes after receiving the call, emergency medical technicians (EMTs) Todd Smith and Sharon Flannery arrived on the *Page 4 
scene, along with EMT trainee Marilyn Chaffin. Biser regained consciousness, and the EMT's began treating his wounds and transported him to Adena hospital. Biser stated to the EMT's that he was diabetic and had taken his insulin that day. However, the EMT's were not able to take his blood-glucose level because the Accu-check machine malfunctioned. Chaffin testified that she noticed one of Biser's pupils was bigger than the other, but she failed to note this in her report.
 {¶ 10} Dr. Kashubeck examined Biser at the emergency room of Adena Hospital. In his report, he noted that Biser's pupils were round and equal in size, and that Biser denied any pain anywhere. The report also noted that Biser complained of a laceration to his right eye and a bump to the back of the head, and that he answered questions and followed commands appropriately. Biser refused emergency room treatment for his head injuries and his diabetes, despite an elevated blood-glucose level of 465. Biser stated that he had insulin to treat the diabetes at home and did not want to purchase more at the hospital. He also refused a CAT Scan, which the doctor had recommended. The doctor discharged Biser from the hospital, but ordered him to return immediately if he experienced any vomiting, confusion or vision problems.
 {¶ 11} Ms. Preston and Ms. Jones went to check on Biser following his return from the hospital that same day, April 15, 2005. Ms. Preston testified that Biser seemed confused and did not remember being involved in a fight, but, instead, told her he had been singing karaoke that night. He acknowledged being at the emergency room and gave Ms. Preston his paperwork from that visit. The next day, April 16, 2005, Ms. Preston and Ms. Jones went again to *Page 5 
check on Biser. Ms. Jones testified that Biser did not invite them in, but cracked the door and told them he felt sick to his stomach and asked them to leave him alone.
 {¶ 12} Biser's cousin, Beth Spangler testified that she visited Biser on three separate occasions on April 16, 2005. She first stopped by in the morning and gave him Advil for his headache. She stopped by again at 1:00 pm, and he continued to complain that his head hurt, and he wanted everyone to go away. Finally, she returned at 5:00 pm and brought him food. She testified that Biser told her he had taken his insulin that day. She also testified that there were two bottles of insulin in the refrigerator.
 {¶ 13} Ms. Preston testified that on Tuesday, April 19, 2005, she received a voicemail from one of Biser's family members, who had been unable to contact him. Ms. Preston knocked on Biser's door, but received no response. She opened his door with her master key and found Biser lying on the floor, unconscious. She testified that Biser struggled to breathe, and his feet and left arm had turned black. Ms. Preston instructed a neighbor to call 911, and an ambulance arrived within seven to eight minutes to transport Biser to the hospital.
 {¶ 14} At the emergency room, Biser underwent a CAT scan of his head, which indicated that he had a possible skull fracture, a small subdural hematoma, and subarachnoid hemorrhage. Additionally, Biser's blood-glucose level was 1,169, and he was in severe diabetic ketoacidosis, a lethal condition resulting from a diabetic's failure to take prescribed insulin. Doctors transported Biser to *Page 6 
Grant Medical Center in Columbus, Ohio, where he underwent exploratory surgery in his abdomen. The surgeons discovered that his right bowel and a portion of his right colon were necrotic, a condition from which no one could survive. Biser died several hours later. After performing an autopsy, Deputy Coroner Trent ruled the cause of death to be homicide due to blunt force craniocerebral injuries.
 {¶ 15} Dr. Glenn Roush, a radiologist, testified that he reviewed Biser's CAT Scan from Biser's emergency room visit on April 19, 2005. He testified that Biser's CAT Scan indicated he had a skull fracture and brain injury that had occurred recently. Dr. Roush also testified that he has "never seen anyone with this sort of injury be able to function."
 {¶ 16} Dr. William Cox, a forensic neuropathologist serving for the Franklin County Coroner, testified that he reviewed Biser's autopsy protocol, toxicology report, and medical records and determined that the cause of death listed by Dr. Trent on the death certificate was incorrect. Dr. Cox opined that Biser's death resulted from diabetic ketoacidosis. He testified that the punch Biser received and subsequent fall to the ground caused him to suffer contusions to his brain that damaged his frontal lobes. Dr. Cox testified that the damage to Biser's frontal lobes affected his cognitive ability and caused him to become apathetic, uninhibited and disinterested. He further testified that Biser's head injury substantially contributed to his death, and the damage to his frontal lobes "clearly would have adversely affected [Biser's] ability to look after himself." *Page 7 
 {¶ 17} A jury found Smith guilty on both counts of felonious assault and involuntary manslaughter. After merging the two counts, the trial court sentenced Smith to eight years in prison and ordered him to pay $49,018.33 in restitution, plus court costs on the charge of involuntary manslaughter.
 {¶ 18} Smith asserts the following assignments of error on appeal:
 I. THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE TO PROVE THAT MR. SMITH WAS GULTY OF INVOLUNTARY MANSLAUGHTER AS ALLEGED IN THE INDICTMENT. THAT DEPRIVED MR. SMITH OF HIS RIGHT TO DUE PROCESS, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 II. THE JURY'S VERDICT, FINDING MR. SMITH GUILTY OF INVOLUNTARY MANSLAUGHTER, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE TRIAL COURT ERRED BY IMPOSING RESTIUTION WITHOUT CONSIDERING MR. SMITH'S ABILITY TO PAY.
 II. Sufficiency of Evidence {¶ 19} In his first assignment of error, Smith contends there is insufficient evidence to sustain his conviction of involuntary manslaughter. Smith concedes his felonious assault conviction and focuses his argument solely on his conviction for involuntary manslaughter.
 {¶ 20} A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. This is a question of law that we review de novo. See id. In analyzing the sufficiency of evidence to sustain a criminal conviction, an appellate court must construe the evidence in a light most favorable to the *Page 8 
prosecution. State v. Hill (1996), 75 Ohio St.3d 195, 205,661 N.E.2d 1068. After construing the evidence in this manner, the test for determining sufficiency is whether any rational trier of fact considering the evidence could have found all essential elements of the charged offenses proven beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 21} Under R.C. 2903.04(A), a person is guilty of involuntary manslaughter when he causes the death of another "as a proximate result" of the commission of an underlying felony offense. The underlying felony in this case is felonious assault, R.C. 2903.11(A)(1), which provides that no person shall knowingly cause physical harm to another.
 {¶ 22} Under the common law, a person could not be convicted of the offense of involuntary manslaughter unless the commission of the underlying offense was the "proximate cause" of the death of the victim. See Jackson v. State (1920), 101 Ohio St. 152, 127 N.E. 870. When the common-law offense was codified, the Ohio General Assembly initially dropped the requirement of proximate cause. In 1974, though, the General Assembly added the "proximate result" element to the modern offense of involuntary manslaughter. In interpreting this new element, the courts of this state have held that the element merely resurrects the prior requirement of proximate cause:
 "The term `proximate result' was used by the General Assembly to refine and limit the verb `cause.' Thus, it is conceivable that [a] defendant's conduct may have caused [the victim's] death in the sense that he set in motion events which culminated in her death, which therefore would not have occurred in the absence of that conduct, but, nevertheless, that the death *Page 9 
was not the proximate result of his conduct if it were not the natural, logical, and foreseeable result of his conduct. . . In this sense, then, `proximate result' bears a resemblance to the concept of `proximate cause' in that [a] defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. . . Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances." State v. Losey (1985), 23 Ohio App.3d 93, 95, 491 N.E.2d 379 (citations omitted).
 {¶ 23} Here, Smith concedes that his felonious assault may have been the "but-for" cause of Biser's death. But he contends it did not proximately cause his death because multiple, unforeseeable events interfered with the natural and logical result of Smith's conduct. Smith argues that it was unforeseeable for Biser to refuse a recommended CAT scan and X-ray at the emergency room. Furthermore, it was unforeseeable for Smith to know that Biser was a diabetic and would refuse insulin at the emergency room. Smith claims that Biser's death resulted from his failure to take his insulin for several days, which caused his diabetic ketoacidosis. In light of these intervening circumstances, he contends the ultimate result is too remote from his conduct for the state to hold him accountable for Biser's death.
 {¶ 24} Courts generally treat the issue of legal causation in the criminal context similarly to that in tort cases because the situations are closely analogous. See, generally, LaFave Substantive Criminal Law (2003), 2nd Ed., Section 6.4(c). When dealing with claims of intervening causation, the proper analysis starts with a determination of whether the intervening act was a mere coincidence or alternatively, a response to the accused's prior conduct. Id at 6.4(f). An intervening cause is a coincidence when the defendant's act merely *Page 10 
places the victim at a certain place at a certain time, thus subjecting the victim to the vagaries of the intervening cause. LaFave gives the example of "A" shoots at "B" but misses. "B" then varies from his intended route, is struck by lightening, and dies. Had "B" continued on his anticipated route, he would not have been injured. The lightening is a coincidence.
 {¶ 25} An intervening act is a response to the prior acts of the defendant where it involves reaction to the condition created by the defendant. Again from LaFave, "A" shoots "B" who is standing near the edge of a cliff. "B" impulsively jumps off the cliff rather than being the target of a second shot. This impulse may fairly be characterized as a normal response.
 {¶ 26} This distinction is important because the law will impose a less exacting standard of legal causation where the intervening cause is a response rather than a coincidence. A coincidence will break the chain of legal causation if it was unforeseeable. Thus, in the first example "A" is not criminally liable for "B's" death, notwithstanding he may be charged with an "attempt." However, for a response to break the chain, it must be both abnormal and unforeseeable. Id. The distinction is premised upon a notion of fairness that finds less reason to hold a defendant liable for bad results where the defendant has merely caused the victim to "be at the wrong place at the wrong time." A defendant who has brought the intervening agency into play in response to the danger he has caused is subjected to a more stringent test if he is to break the chain of causation. Thus, in the second example, "A" will face potential criminal liability for "B's" death. *Page 11 
 {¶ 27} Here the primary intervening events that Smith relies upon to break the chain of causation are Biser's diabetes and failure to take his insulin. Initially, Smith contends it was unforeseeable that Biser would be a diabetic. But courts have routinely held both the tortfeasor and the accused take the victim as they find him. See LaFave at Section 614(h), citing Hamrick v. People (Colo. 1981), 624 P.2d 1320. Thus, Biser's preexisting condition does not break the chain of causation.
 {¶ 28} We must now decide whether Biser's failure to medicate and take care of himself was a coincidence or a response. We conclude it can only be deemed a response. Biser's apathetic conduct occurred as a reaction to the head injuries that Smith caused. Biser's apathy did not happen because he was in the wrong place at the wrong time. This is not a case of "A" hits "B" in the head causing minor injuries; "B" goes to the hospital where he contracts a rare disease from his treating doctor. That sequence would present a coincidence.
 {¶ 29} Because we are dealing with a response, we must next decide whether Biser's failure to medicate and care for himself was both abnormal and unforeseeable. All the medical testimony in the record indicates the victim's conduct was neither. Dr. Roush testified a person suffering a skull fracture and brain injuries Biser received would not function normally. Dr. Cox testified Smith's punch and the resulting fall caused contusions to Biser's brain and damaged the frontal lobes. Dr. Cox indicated these injuries caused Biser's apathy and adversely affected his ability to care for himself. We believe that it is clearly foreseeable that someone with a fractured skull, a subdural hematoma *Page 12 
and a subarachnoid hemorrhage might lose the ability to act rationally. In doing so, we rely on the proposition that an accused need not foresee the precise consequences of his conduct. To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct. State v. Losey (1985), 23 Ohio App.3d 93 at96-97. Self-inflicted harm attributable to a victim's weakened conditions are quite normal and do not break the causal chain. LaFave at Section 6.4(h) citing Commonwealth v. Stafford (1973), 451 Pa 95, 301
A.2d 600 (blows to the head resulted in victim's weakened condition whereby he was found unconscious on his bed and ultimately died). Thus, we conclude Biser's failure to medicate and seek proper treatment is neither abnormal nor unforeseeable. In light of this conclusion, Biser's conduct is not an intervening cause that breaks the chain of legal causation set in motion by Smith.
 III. Manifest Weight {¶ 30} In his second assignment of error, Smith contends that the jury's verdict finding him guilty of involuntary manslaughter is against the manifest weight of the evidence.
 {¶ 31} An allegation that a jury verdict is against the manifest weight of the evidence requires us to assess whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy (1998),84 Ohio St.3d 180, 193, 702 N.E.2d 866. The reviewing court assumes the role of a "`thirteenth juror' and [may] disagree[ ] with the fact finder's resolution of conflicting testimony." State v. Thompkins
(1997), *Page 13 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652.
 {¶ 32} In conducting this review, the reviewing court must examine the entire record and consider the credibility of witnesses, keeping in mind that the jury is generally better-suited to resolve credibility issues.State v. Thomas (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356; State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The reviewing court may reverse a conviction only if it appears that the jury "`clearly lost its way, creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins at 387, 678 N.E.2d 541, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. We will not, however, overturn a conviction if the state presented substantial evidence upon which the jury could have reasonably concluded, beyond a reasonable doubt, that all the essential elements of the charged offenses were established. State v. Eskridge (1988), 38 Ohio St.3d 56,526 N.E.2d 304, paragraph two of the syllabus.
 {¶ 33} Smith contends that the jury lost its way and created a manifest miscarriage of justice by finding him guilty of involuntary manslaughter. He argues that an individual relying on ordinary experience could not have foreseen that a punch to the head of an ordinary-looking thirty-nine year old man would cause the man's death four days later due to internal injuries related to untreated diabetes. *Page 14 
 {¶ 34} After reviewing the record, and considering the credibility of the State's witnesses, we conclude that the State has presented substantial evidence upon which the jury could have reasonably concluded, beyond a reasonable doubt, that Smith's punch to the head proximately caused Biser's death. In support of this conclusion, we rely upon the facts and reasoning from our analysis of Smith's first assignment of error. Additionally, reviewing witness credibility, we conclude that the State's two expert witnesses are clearly credible as experts in their respective fields of medicine. Thus, the jury was free to accept their opinions that Smith's conduct set in motion the chain of events that caused Biser's death.
 {¶ 35} Smith also contends that Dr. Cox offered improper testimony that contributed to the jury's erroneous conclusion. The testimony at issue began when Smith's counsel asked Dr. Cox, "[i]f you were to strike a man with your fist, on the side of the head and cause the injuries that were discussed. . . [and] you were not aware that man had a severe metabolic illness like diabetes, would you expect that man to die from it?"
 {¶ 36} Dr. Cox responded by testifying, "[y]ou take your victim as you find him." He then explained the different variables that could be present in an incident such as this, and ultimately concluded that under the principles of forensic medicine, a person is responsible for the injuries he causes despite not knowing of an underlying abnormality. Dr. Cox further stated, "[w]e let the courts figure it out at that point." *Page 15 
 {¶ 37} On re-direct examination, counsel for the State asked Dr. Cox what he meant by the statement, "you take your victim as you find them." Dr. Cox responded with an example of a seventy-five year old man who died from a heart attack. He stated that if the man suffered the heart attack while shoveling snow, he would rule it as a natural death. However, if the man suffered the heart attack while being robbed at gunpoint, and the anxiety of the robber caused the heart attack, he would rule the death a homicide.
 {¶ 38} Initially, we note that Smith's counsel did not object to this testimony at trial. Therefore, he has waived all but plain error.State v. Ballew (1996), 76 Ohio St.3d 244, 251, 667 N.E.2d 369. Under a plain error analysis, reversal is warranted only when the outcome of the trial clearly would have been different without the error. Id.
(citations omitted).
 {¶ 39} At trial, the judge clearly explained to the jury that the court provides the instructions of law, and it is the jury's duty to accept these instructions and apply the law as it is given. Additionally, counsel for Smith and for the State both reiterated to the jury during closing arguments that the court, and not the attorneys, instructs and defines the law to them. Therefore, we conclude that Dr. Cox's testimony does not constitute plain error because of the trial court's explanation that the court, and not attorneys or witnesses, gives instructions on the law and the presumption that jurors follow the instructions given to them by the court. Pang v. Minch (1990),53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus. *Page 16 
 IV. Restitution {¶ 40} In his third assignment of error, Smith contends that the trial court erred in imposing restitution in the amount of $49,018.33 upon him without first considering his ability to pay.
 {¶ 41} R.C. 2929.19(B)(6) provides that "[b]efore imposing a financial sanction under section 2929.18 of the Revised Code[,] . . . the court shall consider the offender's present and future ability to pay the amount of the sanction or fine." This statute does not require a trial court to hold a specific hearing on the issue of ability to pay, although courts may choose to do so. State v. Kelly (2001),145 Ohio App.3d 277, 282, 762 N.E.2d 479; State v. Sillett, Butler App. No. CA2000-10-205, 2002-Ohio-2596; State v. Southerland, Butler App. No. CA2001-06-153, 2002-Ohio-1911. Rather, the statute requires a court to consider the offender's present and future ability to pay. See State v.Martin (2000), 140 Ohio App.3d 326, 338, 747 N.E.2d 318 and State v.Karnes (Mar. 29, 2001), Athens App. No. 99CA42.
 {¶ 42} "Although preferable for appellate review, a trial court need not explicitly state in its judgment entry that it considered a defendant's ability to pay a financial sanction. Rather, courts look to the totality of the record to see if the requirement has been satisfied." State v. Ray, Scioto App. No. 04CA2965, 2006-Ohio-853, at ¶ 26. As we noted in State v. Slater, Scioto App. No. 01CA2806, 2002-Ohio-5343 at ¶ 8, when the record indicates a court considered a pre-sentence investigation report (PSI) that details pertinent financial information (see e.g. Martin, supra; Karnes, supra) or when a transcript reflects that a court *Page 17 
at least considered a defendant's ability to pay, the court has complied with the statute. See e.g. State v. Finkes, Franklin App. No. 01AP-310, 2002-Ohio-1439; State v. McDonald, Delaware App. No. 01CA08033, 2002-Ohio-1122.
 {¶ 43} While there is no mention of Smith's ability to pay restitution in the court's judgment entry, the trial court did indicate in the transcript that it would consider Smith's PSI and victim impact statements before imposing restitution. We believe this satisfies the court's statutory duties in the absence of an express request by the defendant for an evidentiary hearing. Accordingly, we overrule Smith's third assignment of error.
 JUDGMENT AFFIRMED. *Page 18 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 McFarland, P.J. Abele, J.: Concur in Judgment and Opinion. *Page 1