[Cite as *State v. Nicholson*, 2022-Ohio-374.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                         No. 110522

v.                                       :

NASIM NICHOLSON,                         :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 10, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-644528-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John Hirschauer, Assistant Prosecuting Attorney, *for appellee.*

Maxwell Martin, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Nasim Nicholson ("Nasim"), appeals from the trial court's judgment finding him guilty of participating in a criminal gang and sentencing him to an indefinite term of 9 to 12 years' incarceration. Finding no merit to the appeal, we affirm.

## I.    Background

{¶ 2} In October 2019, Nasim was charged in a 25-count indictment.  Count 1, participating in a criminal gang, stemmed from Nasim's conduct from August 1, 2018, to June 19, 2019.  The other counts — 4 counts of attempted murder, 13 counts of felonious assault, 3 counts of discharge of a firearm at or near prohibited premises, 2 counts of improperly handling firearms in a motor vehicle, and 2 counts of improperly discharging firearm at or into habitation — arose out of three separate shooting incidents that occurred on December 4, 2018, January 27, 2019, and January 29, 2019.  Nasim was charged with two codefendants — his brother Onaje Nicholson and his nephew Jesse Sanders.

{¶ 3} Prior to trial, codefendant Sanders entered into a plea agreement with the state whereby he agreed to plead guilty to three counts of felonious assault related to the three shootings and testify against Nasim and Onaje at trial.  After he testified, the remaining firearm specifications and charges against him were nolled, and the trial court sentenced him to four years' probation.

{¶ 4} Sanders testified that he has known Nasim, known as Nas, and Onaje his entire life, and Malik Booker, known as ManMan, and James Booker, known as Mister, for at least ten years.  Sanders testified that on December 4, 2018, he, Nasim, Onaje, and Mister were riding in Sanders's car.  According to Sanders, Onaje was driving, Sanders was in the front passenger seat, Nasim was in the rear passenger seat behind him, and Mister was in the rear passenger seat behind Onaje.  Sanders said that as their car travelled on Forest Avenue near East 116th Street, a gray Ford

passed them going the opposite direction. Sanders testified that as the Ford went by, Onaje said, "there go Ty," referring to Tykis Banks, whom Onaje believed was involved in the murder of an individual named Muddy. Sanders said that upon seeing the Ford, Onaje rolled his window down, blew the car's horn, and then put two fingers out the window and made the peace sign. Onaje then turned the car around and sped up next to Ty's car. Sanders said that when they saw the rear passenger window of the Ford go down, Nasim leaned out of the rear window of their car and fired three to five shots at the Ford with a Glock handgun before Onaje sped away.

{¶ 5} The next shooting incident occurred six to seven weeks later. Sanders testified that on January 27, 2019, he was again riding with Nasim and Onaje in his car. This time Sanders was driving, Onaje was in the front passenger seat, and Nasim was in the rear. Sanders said that as they drove up Svec Avenue toward East 140th Street, Onaje identified a brownish-gold Chevy Impala parked on the street as belonging to an individual named Pablo and then leaned out the window and shot at the car as they drove by. Sanders testified that he kept driving, turned the corner, drove around the block, and passed by the Impala again. Sanders said that this time, Nasim got out of the car and fired more shots at an individual who was trying to duck for cover.

{¶ 6} The third shooting occurred two days later. Sanders testified that he knows Delvonte Philpotts, known as Yelly, from Instagram. He said that at approximately 4 a.m. on January 29, 2019, he, Onaje, and Nasim left the Nicholsons'

house in South Euclid and drove to Cato Avenue in Maple Heights. Onaje drove, Sanders sat in the front passenger seat, and Nasim sat in the rear. Sanders said that Onaje identified a home on Cato Avenue as Yelly's house. Sanders testified that he parked the car around the corner on Arch Street, and Onaje and Nasim got out of the car and ran toward Yelly's house. Sanders said that he heard at least ten gunshots, after which Onaje and Nasim ran back to the car. Sanders testified that later the same day, he received a call from Darren Allen, known as Puff, who said that Yelly's sister was posting about the shooting on Facebook and blaming it on Puff, Onaje, and Nasim. Sanders said he texted Onaje and told him, "one of y'all grazed a baby," and Onaje responded, "how you know?" Sanders said that when he texted Onaje that "Puff called and said they posted it on Facebook," Onaje responded, "bet," which means "okay."[1]

{¶ 7} Although Sanders denied being a member, he testified that Nasim, Onaje, and Puff identified themselves as members of a "group" called the Real Shooters, which he said they abbreviated as "RS." Sanders identified Puff's Instagram account from state's exhibit No. 405 as "rs_puffdiditagain," Nasim's Instagram account as "rs_nas4rmtha6," and Onaje's account as "rs_ojayy116." Sanders identified Nasim and Onaje from their Instagram pictures on state's exhibit No. 405, and confirmed that Onaje was wearing a hoodie with the words "President

---

[1] No one was injured in any of the shootings. Ashley Brooks, who lived in the house on Cato Avenue with her brother Yelly and her three children, testified at trial that she posted on Facebook about the shots hitting a baby to scare the shooters and let them know that "things like that can happen when you shoot into a house with children."

RS" in his Instagram picture. Sanders said that Onaje and Nasim carried guns "every day" in 2018 and 2019 and different guns would be passed around the group. Sanders also identified state's exhibit No. 407 as a picture of Nasim holding a Glock with a laser light attachment.

{¶ 8} Sergeant Alfred Johnson, supervisor of the Cleveland Police Department Gang Impact Unit, testified that he became aware of the Real Shooters gang before Nasim was implicated in the three shootings for which he was charged after an incident near 117th Street and Kinsman Avenue where an arrest was made and several firearms were recovered. Later, after the December 2018 shooting incident in this case, Sgt. Johnson spoke with the mother of one of the intended victims and, in light of what she told him, he began investigating the social media accounts of Nasim, Onaje, Puff, and Malik Booker, as well as the accounts of the people who followed them or commented on their posts. Sgt. Johnson testified that the posted pictures were generally of males holding guns, which he said is how gangs boast to each other on social media. He testified that gangs typically use illegally obtained firearms and frequently trade the guns among the gang members, especially if a gun has been used by a member in a shooting.

{¶ 9} He testified that the social media posts viewed by the detectives in the gang unit established that the Real Shooters gang operated near the area of East 116th Street in the city of Cleveland, between Kinsman and Buckeye Roads. Detective Michael Harrigan, who took over the investigation from Sgt. Johnson in January 2019, and was qualified at trial as a gang expert, testified that as a result of

his investigation, he concluded there were six members of the Real Shooters gang, including Puff, brothers Nasim and Onaje, and codefendant Jesse Sanders.

{¶ 10} Both Sgt. Johnson and Det. Harrigan testified that although the Real Shooters was a criminal gang in and of itself, the RS gang associated itself with the Heartless Felons gang. Both Sgt. Johnson and Det. Harrigan identified social media posts and pictures that established consistent hand signs used by the gang members, which for the Real Shooters was either pointing a real gun or a finger gun at the person's own head, and for the Heartless Felons, a hand sign with two middle fingers folded down into the palm and the other fingers extended. The social media posts viewed by the detectives also included other text or graphic symbols representing gang membership, such as the trademark broken heart symbol of the Heartless Felons, and identifying apparel (a tee-shirt with the letters RS and broken hearts and a hoodie stating "President RS").

{¶ 11} With respect to Nasim's association with the Real Shooters, Sgt. Johnson and Det. Harrigan identified state's exhibit Nos. 717-721, 729-732, and 779 as pictures from social media of Nasim, often with the other codefendants or known associates of the gang, either holding up gang signs for the Real Shooters or Heartless Felons, a gun, or both.

{¶ 12} Sgt. Johnson testified that Nasim used several Instagram accounts, one of which was "rs_nas4rmtha6." Sgt. Johnson testified that other suspected members of the Real Shooters had the similar prefatory "rs" on their Instagram account names. Det. Harrigan testified that there was also a graphic small "r" and

money sign on the "rs_nas4rmtha6" profile page, used to show membership in the Real Shooters, as well as a broken heart for the Heartless Felons, and the numbers 1, 1, and 6, indicating the Real Shooter's geographic territory on East 116th Street. Sgt. Johnson testified that Nasim's other Instagram accounts — "naso4rm116" and "nas_heartless" — likewise established connections with the Real Shooters and Heartless Felons.

{¶ 13} In addition to the social media posts establishing his membership in the Real Shooters from August 1, 2018, to June 19, 2019, the evidence produced at trial implicated Nasim in the December 14, 2018, January 27, 2019, and January 29, 2019 shootings. As set forth above, codefendant Sanders testified that Nasim was involved in each shooting. Additionally, Det. Harrigan testified that in his post-arrest interview, Nasim admitted to carrying a Glock — which according to Kristen Koeth, the forensic scientist who examined recovered shell casings, was the gun used in two of the shootings — although Nasim later recanted this statement.

{¶ 14} Nasim also admitted at one point in his interview with Det. Harrigan to his involvement in the January 27, 2019 shooting, stating that "they started shooting and we shot back," a statement Det. Harrigan testified he knew to be untrue but that established Nasim's presence at the scene. Nasim also told Det. Harrigan that he knew about the "beef" with Pablo that prompted the shooting. Similarly, with respect to the January 29, 2019 shooting in Maple Heights, Nasim told Det. Harrigan he was aware there was an ongoing argument on Instagram involving Yelly and two other males.

{¶ 15} Nevertheless, there was conflicting evidence regarding Nasim's involvement in the three shootings. Sgt. Johnson testified that the victims of the December 4, 2018 shooting identified the shooters in their written statements to police as Puff and Onaje and made no mention of Nasim. Moreover, a still photograph from a surveillance camera from a home on Forest Avenue showed an individual leaning out of the driver's side rear passenger window of Sanders's car with his arm extended as if he were shooting, calling into question Sanders's testimony that Nasim, who according to Sanders was sitting in the rear passenger seat behind the front passenger, was the shooter. Likewise, Sanders testified that Nasim used a 1911 silver gun in the second shooting, but no casings consistent with a 1911 firearm were found at the scene. With regard to the third shooting incident, Ashley Brooks, who lived in the house on Cato Avenue with her brother Yelly and her three children, told the Maple Heights patrolman who responded to the scene after the shooting that she thought Puff and Onaje were the perpetrators because they had been threatening her on Instagram prior to the shooting. She made no mention of Nasim's involvement in the Instagram threats.

{¶ 16} The jury found Nasim guilty of Count 1, participating in a criminal gang, as well as the one- and three-year firearm specifications, and not guilty of the remaining charges. The trial court sentenced him to 3 years on the firearm specification, consecutive to an indefinite sentence of 6 to 9 years on the underlying offense, for a total sentence of 9 to 12 years. This appeal followed.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 17} In his first assignment of error, Nasim contends that the evidence was insufficient to support his conviction for participating in a criminal gang.

{¶ 18} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 19} Nasim was convicted of participating in a criminal gang from August 1, 2018, to June 19, 2019, in violation of R.C. 2923.42(A), which states:

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 20} Under this statutory section, the state is required to prove four elements:

(1) the existence of a criminal gang, (2) appellant's active participation in the gang, (3) appellant's knowledge that the gang engages in or has engaged in a pattern of criminal gang activity, and (4) appellant's purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct.

*State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 72. We address each element in turn.

### 1. Existence of a criminal gang

{¶ 21} Under R.C. 2923.41(A), a criminal gang is defined as an ongoing organization, association, or group, consisting of three or more persons who engage in or have engaged in a pattern of criminal gang activity, which has as one of its primary activities the commission of one or more felonies, has a common name or common identifying signs, symbols, or colors, and the persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal activity.

{¶ 22} Nasim does not dispute that the Real Shooters was a criminal gang. Nevertheless, we find that the state introduced sufficient testimony at trial to establish that fact. Det. Harrigan testified that there were six members of the Real Shooters gang. Sgt. Johnson testified that the Real Shooters operated in the area of East 116th Street in the city of Cleveland between Kinsman Road and Buckeye Road. He testified further that Real Shooters' members could be identified by their repeated and deliberate use of hand signs, including either pointing a real gun or a finger gun at the person's own head. Gang association was also established by the members' pervasive use of social media showing both gang hand signs and

suspected illegal possession of firearms traded among members, which Sgt. Johnson testified is common among gang members; the identifying mark of "rs" in gang member social media user names; apparel with Real Shooters insignia on it; and text and graphic symbols, such as broken hearts or a small "r" and money sign, representing gang membership. The state also produced evidence that Real Shooters' members had engaged in three separate shooting incidents within a short time of each other. This evidence, considered in a light most favorable to the state, is sufficient to prove the first element of participating in a criminal gang under R.C. 2923.42(A).

### 2. Active participation

{¶ 23} "[T]he active participation element of the criminal gang statute requires the state [to] demonstrate that appellant actually — not just nominally — took part in the criminal gang." *State v. Smith*, 6th Dist. Lucas No. L-15-1027, 2017-Ohio-776, ¶ 38. "Actual participation requires that the appellant perform 'some role to benefit the gang.'" *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017 Ohio-4339, at ¶ 76, quoting *Smith* at ¶ 39.

{¶ 24} The state presented sufficient direct and circumstantial evidence that Nasim was an active member of the Real Shooters gang. Nasim maintained multiple Instagram accounts — "rs_nas4rmtha6," "naso4rm116," and "nas_heartless" — that established his affiliation with both the Real Shooters and the Heartless Felons. Several of the photographs introduced by the state, which were screenshots of both Nasim's and other Real Shooters members' social media accounts, were posted by

Nasim's own Instagram account; the others were posted by individuals that Nasim was known to associate with. The photographs depicted Nasim and other gang members flashing gang signs, wearing clothing with gang insignia, and brandishing firearms traded among the members and used in the shootings for which Nasim was charged.

{¶ 25} The state also produced evidence that would lead a reasonable factfinder to believe that Nasim actually took part in the gang and performed a role to benefit the gang. Specifically, the state produced evidence that Nasim was an active participant in the three shootings for which he was indicted. Although there was conflicting evidence regarding Nasim's participation, the state produced sufficient evidence that, if believed, demonstrated that he was involved in all three shootings. Indeed, codefendant Sanders gave detailed testimony regarding Nasim's active participation in each incident. Furthermore, Nasim's postarrest interview with Det. Harrigan established that Nasim knew about the "beefs" with Pablo and Yelly that led to the two shootings in January 2019. Nasim also initially admitted in this interview to owning a Glock, the gun used in two of the shootings. He also admitted before recanting that he was involved in the January 27, 2019 shooting. This evidence, if believed, established that Nasim did more than simply flash the hand sign of the Real Shooters on social media; he actively engaged in conduct that furthered some interest of the gang. Accordingly, we find that the state produced sufficient evidence of the second element of R.C. 2923.42(A).

### 3. Knowledge of the gang's pattern of criminal activity

{¶ 26} Having found the state's evidence sufficient to prove the first two elements of R.C. 2923.42(A), we now consider the third element — Nasim's knowledge that the Real Shooters gang engages in or engaged in a pattern of criminal activity.

{¶ 27} A pattern of criminal gang activity occurs when "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, or be in complicity in the commission of two or more" specified offenses. R.C. 2923.41(B)(1). The specified offenses include offenses committed by a juvenile that would be felonies if committed by an adult. R.C. 2923.41(B)(1)(a).[2]

{¶ 28} There is a "pattern" of criminal activity regarding the specified offenses when at least one of the two or more specified offenses is a felony, at least one of the offenses occurred on or after January 1, 1999, the most recent of the offenses occurred within five years of another of the specified offenses, and the specified offenses are committed on separate occasions by two or more persons. R.C. 2923.41(B)(2).

{¶ 29} The state produced evidence that two or more Real Shooters members were involved in shootings on December 4, 2018, January 27, 2019, and January 29, 2019, which establishes a pattern of criminal gang activity. The state also produced

---

[2] Nasim was 17 years old when the felony offenses for which he was charged were committed.

evidence that the shootings occurred while Nasim was a member of the Real Shooters, and in fact, that he was an active participant in the shootings. In light of this evidence, the trier of fact could reasonably infer that Nasim had knowledge of the gang's pattern of criminal activity. Accordingly, we conclude that the state produced sufficient evidence to prove the third element of R.C. 2923.42(A).

### 4. Purposeful promotion, furtherance, or assistance of, or commission of or engagement in any criminal conduct

{¶ 30} Finally, we must consider whether the state produced sufficient evidence to establish the fourth element of R.C. 2923.42(A); i.e., that Nasim purposely promoted, furthered, assisted, or engaged in any criminal conduct.

{¶ 31} Sgt. Johnson testified that gangs boast to each other on social media by displaying guns and that Nasim appeared in numerous social media posts either flashing gang symbols, holding firearms, or both. Thus, the jury could reasonably interpret Nasim's social media posts and appearances as purposeful promotion, furtherance, and assistance of the Real Shooters gang.

{¶ 32} Furthermore, codefendant Sanders testified that Nasim was one of the shooters in each of the shooting incidents. If believed, this evidence would certainly permit the trier of fact to conclude that Nasim committed criminal conduct. Additionally, the jury viewed Nasim's postarrest interview with Det. Harrigan in which Nasim admitted before recanting both to owning a Glock, the gun used in two of the shootings, and to participating in the second shooting.

{¶ 33} Upon consideration, we find the state's evidence, if believed, sufficient to prove Nasim's purposeful promotion, furtherance, assistance of, or commission

of criminal conduct. Having also found the state's evidence sufficient as to the other three elements of participating in a criminal gang under R.C. 2923.42(A), we find no merit to Nasim's sufficiency argument on appeal. The first assignment of error is therefore overruled.

## B. Jury Instructions

{¶ 34} Nasim was charged in Count 1 with participating in a criminal gang as follows:

> [Nasim] did actively participate in a criminal gang, with knowledge that the criminal gang engages in or had engaged in a pattern of criminal gang activity, and did purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or did purposely commit or engage in any act that constituted criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, to wit: Attempted Murder, R.C. 2923.02/R.C. 2903.02 and/or Aggravated Robbery, R.C. 2911.01 and/or Robbery, R.C. 2911.02 and/or Felonious Assault, R.C. 2903.11 and/or Improper Discharge into a Habitation, R.C. 2923.161 and/or Discharge Over a Roadway, R.C. 2923.162 and/or Improperly Handling of a Firearm, R.C. 2923.16.

{¶ 35} In his second assignment of error, Nasim contends that the jury was not instructed on the elements of aggravated robbery, robbery, or discharge over a roadway with respect to the fourth element of participating in a criminal gang, i.e., purposely promoting, furthering, or assisting any criminal conduct, or purposely committing or engaging in criminal conduct. Thus, he contends that the trial court committed plain error by not instructing the jury on the essential elements of all the offenses upon which the state relied to support a conviction in Count 1.

**{¶ 36}** Nasim concedes that he did not object to the charge,[3] but maintains that the error was a plain error affecting his substantial rights.[4]

**{¶ 37}** Plain error is an obvious error or defect in the trial court proceedings that affects a substantial right. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. An alleged error is plain error only if the error is obvious and it affected the outcome of the trial. *Id.* We take notice of plain error with the "utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. The burden of demonstrating plain error is on the party asserting the error. *Rogers* at *id.*; *State v. McFeeture*, 2015-Ohio-1814, 36 N.E.3d 689, ¶ 84 (8th Dist.).

**{¶ 38}** Nasim contends the faulty instructions resulted in plain error because "the jury may have mistakenly convicted [him] of participating in a criminal gang due to a belief that he committed aggravated robbery, robbery, or discharge over a roadway, even though they were never instructed on the elements of these offenses."

**{¶ 39}** "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged."

---

[3] Crim.R. 30(A) states, in pertinent part, that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."

[4] Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

*State v. Wamsley,* 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 17. However, "the failure to instruct on each element is not necessarily reversible as plain error." *Id.* "Rather, an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *Id.*

{¶ 40} We find no plain error. First, there was no evidence of aggravated robbery or robbery produced at trial and, therefore, no error in the trial court's failure to instruct on the elements of these offenses. Indeed, any instruction on the offenses would have been improper. *See State v. Sims*, 11th Dist. Lake No. 2001-L-081, 2003-Ohio-324, ¶ 60 ("The trial court may not instruct a jury where there is no evidence to support a particular issue.").

{¶ 41} Moreover, under R.C. 2923.42(A), to prove the fourth element of participation in a criminal gang, the state must prove that the defendant purposely promoted, furthered, or assisted any criminal conduct *or* purposely committed or engaged in criminal conduct. Thus, the jury could have found this element of the participating-in-a-criminal-gang offense satisfied if it concluded that Nasim promoted, furthered, and assisted in criminal conduct by the Real Shooters, without any finding that he committed or engaged in aggravated robbery, robbery, or discharge over a roadway. Significantly, the jury found Nasim not guilty of Counts 8, 12, and 23, which charged him with discharging a firearm on or near prohibited premises, strongly indicating that the jury did not consider the discharge-over-a-roadway offense in reaching its verdict on Count 1.

**{¶ 42}** Because Nasim cannot demonstrate that the trial court's failure to instruct on the elements of aggravated robbery, robbery, or discharge over a roadway affected the jury's verdict in any way, he has not met his burden of proving plain error. The second assignment of error is overruled.

### C. Manifest Weight of the Evidence

**{¶ 43}** In his third assignment of error, Nasim contends that his conviction for participating in a criminal gang was against the manifest weight of the evidence.

**{¶ 44}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶ 45}** Nasim contends that his conviction was against the manifest weight of the evidence because Sanders's testimony was not credible, as reflected in the jury's verdict finding him not guilty of all charges relating to his involvement in the three shootings. He further contends that Sgt. Johnson's and Det. Harrigan's testimony that he was a gang member was "unsupported by evidence" and that the

only evidence he was a gang member came from photographs of him holding guns and flashing what the detectives considered to be "gang signs." Last, he asserts that the jury verdict was inconsistent because he was found not guilty of the charges regarding the shootings and, therefore, his conviction on Count 1 was against the manifest weight of the evidence.

{¶ 46} Based on the record before this court, we cannot say that in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 47} With respect to Sanders's credibility, although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 48} The jury heard Sanders's testimony and was free to determine his credibility. The jury apparently did not believe his testimony about Nasim's

involvement in the shootings, but did believe his testimony that RS stood for Real Shooters and that Nasim was a member of the "group." They were free to do so. Likewise, the jury was free to believe or disbelieve the testimony of Sgt. Johnson and Det. Harrigan, who both testified that based on their extensive experience investigating gang units, the numerous social media postings they examined and testified to demonstrated that the Real Shooters was a criminal gang that operated near the area of East 116th Street between Kinsman and Buckeye Roads and that Nasim was an active member of the gang.

{¶ 49} Finally, contrary to Nasim's assertion, the fact that the jury found him guilty of participating in the Real Shooters criminal gang, while not guilty of participating in the three shooting incidents for which he was also charged, does not undermine confidence in the jury's resolution of the case. As this court has explained:

> Juries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. * * * [I]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts.

*State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 40, quoting *State v. Taylor*, 8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶10. Thus, "courts have consistently rejected the argument that inconsistent verdicts would render a defendant's conviction against the manifest weight of the evidence." *Wells* at *id.*, citing *State v. Jones*, 8th Dist. Cuyahoga No. 108050, 2019-Ohio-5237, ¶ 33, citing *State v. Norman*, 10th Dist. Franklin No. 10AP-680, 2011-Ohio-2870, ¶ 14.

**{¶ 50}** Furthermore, we find no inconsistency in the verdict. The jury was free to believe Sgt. Johnson's and Det. Harrigan's testimony that Nasim was a member of and participated in the Real Shooters criminal gang, while simultaneously finding he did not participate in the three shooting incidents. This is not the case where the evidence weighs heavily against the conviction, and, accordingly, we find that Nasim's conviction was not against the manifest weight of the evidence. The third assignment of error is overruled.

### D. Improper and Irrelevant Evidence

**{¶ 51}** In his fourth assignment of error, Nasim contends that he was prejudiced by the introduction of improper and irrelevant evidence at trial. Specifically, he contends that comments about a separate murder case with which he was charged were shown to the jury when the state played a video of his post-arrest interview with the police. The comments related to Nasim "feeling bad" about something and wishing he could "talk to the family."

**{¶ 52}** Our review of the record demonstrates that prior to trial, the prosecutor conferred with Nasim's counsel about the interview, giving defense counsel an opportunity to request that additional portions of the interview be redacted beyond those already noted for redaction by the state. Text messages exchanged between counsel (court's exhibit No. 1) demonstrate that defense counsel did not request that the state redact the portion of the interview to which Nasim now objects.

**{¶ 53}** The record reflects that immediately after defense counsel objected to the statement, the trial court asked the state and defense counsel to "come up with an agreeable curative instruction" regarding that part of the interview.

**{¶ 54}** Defense counsel told the trial judge:

> I think that we should give a general curative instruction at the time that you give the jury charge, not now, that generally would say — comment again on the fact that there's silent parts for evidentiary reasons that have nothing to do with this case, and again say you've heard things that may be said about other events. You're directed to disregard anything that doesn't have to do with the charges of this case. That would be something — and then it doesn't overemphasize and it's taken at the same time when they're giving instructions. I don't think the state has an objection to that.

(Tr. 1270-1271.)

**{¶ 55}** Shortly thereafter, defense counsel again told the judge that she wanted the curative instruction to be given at the conclusion of trial during the general jury charge, rather than immediately:

> [T]o draw attention to a specific thing is like a highlight and it would only affect primarily my client and so I would ask not to do that at this time. If you want to make it more specific at the time we give the curative instruction, I'm okay with that, I just don't want to do it at this point when they resume the video today.

(Tr. 1275.) The prosecutor then informed the judge that the state was "fine" with whatever curative instruction the court determined to be best for the jury.

**{¶ 56}** Ultimately, the trial court accepted a version of the curative instruction drawn up by counsel for Onaje. Nasim's counsel suggested a few changes to the instruction and then endorsed it. The curative instruction was read to the jury at the conclusion of the jury charge and stated, "Any reference to feeling badly and

desiring to speak to someone's family has nothing to do with any of the parties in this case or any of the matters before you."

{¶ 57} Despite Nasim's assertion that he was unfairly prejudiced by the admission of improper evidence and the "damaging curative instruction," we find no error. As demonstrated by court's exhibit No. 1, although given the opportunity, defense counsel did not ask the state to redact that portion of Nasim's statement to which he now objects. "The defense cannot invite error and later complain about its prejudicial effect on appeal." *State v. Spirko*, 59 Ohio St.3d 1, 8, 570 N.E.2d 229 (1991).

{¶ 58} Moreover, the remedy requested by defense counsel — a curative instruction regarding Nasim's statement given during the general jury charge — was adopted in full by the trial court. And defense counsel specifically approved the wording of the curative instruction.

{¶ 59} Finally, the record reflects that the jury was not aware of the separate homicide with which Nasim was charged, no mention was made of it at trial, and Nasim's statement at issue did not identify any specific facts or names. Thus, in light of the jury's verdict finding Nasim not guilty of the majority of the charges against him and the overwhelming evidence of his participation in a criminal gang, the 1 out of 25 counts on which he was found guilty, we cannot find that Nasim was prejudiced by the admission of the brief snippet of his postarrest interview that was not redacted. The fourth assignment of error is overruled.

### E. Sentencing

{¶ 60} In his fifth assignment of error, Nasim contends that the trial court erred in sentencing him under the Reagan Tokes Law, which became effective March 22, 2019. Under the law, qualifying first- and second-degree felonies committed on or after March 22, 2019, are subject to the imposition of indefinite sentences. The law specifies that these terms will consist of a minimum term selected by the sentencing judge from a range of terms set forth in R.C. 2929.14(A) and a maximum term determined by formulas set forth in R.C. 2929.144.

{¶ 61} Nasim contends that the Reagan Tokes Law is unconstitutional because it violates his constitutional rights to trial by a jury, separation of powers, and due process. We decline to address Nasim's constitutional challenge to the law.

{¶ 62} "[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *State v. Awan*, 22 Ohio St.3d 120, 122, 478 N.E.2d 277 (1986). The record reflects that Nasim did not raise any constitutional challenge to the Reagan Tokes Law in the trial court. His failure to do so forfeits the argument.

{¶ 63} Nasim also contends that the Reagan Tokes Law should not be applied to him because the dates of the three shootings for which he was charged and which he contends "the state relied upon as foundational for the gang charge," all preceded March 22, 2019, the effective date of the law. Defense counsel raised this argument in the trial court, and therefore, we will address it.

**{¶ 64}** We find it has no merit, however. The date range for the conduct in Count 1, participating in a criminal gang, for which Nasim was found guilty, was between August 21, 2018, and June 19, 2019, which obviously includes a time period after the Reagan Tokes Law became effective. As discussed above with respect to Nasim's argument regarding the manifest weight of the evidence, the fact that Nasim was not guilty of the three shooting incidents is not determinative of his guilt on Count 1. Because Nasim was found guilty of conduct encompassed by the Reagan Tokes Law, the trial court did not err in sentencing him under the law. The fifth assignment of error is overruled.

**{¶ 65}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MARY EILEEN KILBANE, J., CONCUR