[Cite as *State v. Pennington*, 2024-Ohio-5681.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :    CASE NO. 23CA12

v.                                :

JUSTIN A. PENNINGTON,             :    DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.         :

_____

APPEARANCES:

William T. Cramer, Westerville, Ohio, for appellant[1].

Keller J. Blackburn, Athens County Prosecuting Attorney, Athens, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED: 11-26-24
ABELE, J.

{¶1}    This is an appeal from an Athens County Common Pleas Court judgment of conviction and sentence.  Justin Pennington, defendant below and appellant herein, assigns six errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "APPELLANT'S RIGHTS TO A FAIR TRIAL UNDER
> THE STATE AND FEDERAL CONSTITUTIONS WERE
> VIOLATED BY THE IMPROPER ADMISSION OF A 911

_____
[1]    Different counsel represented appellant during the trial court proceedings.

CALL THAT WAS UNFAIRLY PREJUDICIAL IN
VIOLATION OF EVID.R. 403(A)."

SECOND ASSIGNMENT OF ERROR:

"APPELLANT'S RIGHTS TO CROSS-EXAMINATION
UNDER THE STATE AND FEDERAL CONSTITUTIONS
WERE VIOLATED WHEN THE TRIAL COURT LIMITED
DEFENSE COUNSEL'S CROSS-EXAMINATION OF A
VICTIM WHO WAS PERMITTED TO REMAIN IN THE
COURTROOM DURING OTHER TESTIMONY PURSUANT TO
MARSY'S LAW."

THIRD ASSIGNMENT OF ERROR:

"APPELLANT'S DUE PROCESS RIGHTS UNDER THE
STATE AND FEDERAL CONSTITUTIONS WERE
VIOLATED BY A CONVICTION FOR FELONY MURDER
THAT WAS NOT SUPPORTED BY SUFFICIENT
EVIDENCE ON THE ISSUE OF PROXIMATE CAUSE."

FOURTH ASSIGNMENT OF ERROR:

"APPELLANT'S CONVICTION FOR MURDER WAS NOT
SUPPORTED BY THE WEIGHT OF THE EVIDENCE ON
THE ISSUE OF PROXIMATE CAUSE."

FIFTH ASSIGNMENT OF ERROR:

"APPELLANT'S CONVICTION FOR MURDER WAS NOT
SUPPORTED BY THE WEIGHT OF THE EVIDENCE ON
THE ISSUE OF SELF-DEFENSE."

SIXTH ASSIGNMENT OF ERROR:

"APPELLANT'S CONVICTION FOR FELONIOUS
ASSAULT IN COUNT FIVE IS NOT SUPPORTED BY

THE WEIGHT OF THE EVIDENCE."

{¶2} On June 13, 2021, appellant assaulted Blaine Sharpe at his home, then assaulted Nia Robinson and Heather Irwin at Irwin's home. Sharpe later died from his injuries.

{¶3} In June 2021, an Athens County Grand Jury returned an indictment that charged appellant with (1) one count of murder in violation of R.C. 2903.02(B), an unclassified felony, (2) one count of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony, (3) one count of burglary in violation of R.C. 2911.12(A)(2), a second-degree felony, (4) one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony, (5) one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, (6) one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, (7) one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony, and (8) one count of breaking and entering in violation of R.C. 2911.13(B), a fifth-degree felony. Appellant entered not guilty

pleas. At appellee's request, the trial court dismissed count seven (felonious assault) and renumbered count eight of the indictment to count seven.

{¶4} At trial, Courtney Brown, the only child of Blaine and Cindy Sharpe, testified that on June 13, 2021, she lived a quarter of a mile from her parents on the same road. Brown assumed her father knocked on her door that day, but instead appellant entered her home and wore shorts with "no shirt and blood on his stomach." Brown explained that she attended K-12 school with appellant, but did not expect him to visit her home. Appellant told Brown, "he had just beat the pulp out of my Dad and he was laying [sic.] on ... his front porch." Appellant told Brown that her father "called the law and got his kids taken away." Brown stated that appellant "seemed frantic. Kind of panicky."

{¶5} Brown quickly drove to her parents' home and found her father "laying [sic.] on the porch unresponsive, not breathing." Brown quickly returned to her house to call her mother to tell her to check on her father. Brown then called 911 as she

returned to her parents' home.

{¶6} Appellee played Brown's 911 call for the jury. Brown identified her voice and explained that she stayed on the phone with 911 until emergency medical services (EMS) arrived. On the 911 call, Brown stated:

> Somebody just stopped at my house and told me they beat the hell out of my Dad. He's laying on his front porch right now and I don't think he's breathing . . . The guy who just did it he just stopped at my house and told me... and his name is Justin Pennington.

{¶7} Brown's mother, Cindy, started cardiopulmonary resuscitation (CPR) pursuant to the 911 operator's instructions, and Brown later performed CPR. They performed CPR for about 15-20 minutes, but could not perform "the breath component" because "his mouth was clear full of blood." Once EMS arrived, Brown returned to her home and noticed a fresh blood stain on her front door.

{¶8} On cross-examination, Brown explained that appellant dated her cousin, Nia Robinson. Brown acknowledged that she had "known [her father] to fight," and he had been a heavy drinker, but she did not know whether he used methamphetamine.

{¶9}    Cindy Sharpe, Blaine Sharpe's widow after 30 years of marriage, testified that on June 13, 2021, she lived with Blaine on Sargent Road.  Cindy swam in their pool while Blaine painted her wooden Adirondack chairs.  Afterward, Cindy spoke with Blaine and went inside to change.  Between 4 and 5 p.m., Blaine entered the home to nap and Cindy went to her bedroom to watch TV.  In addition to the TV, other noise in her bedroom included a fan, a window air conditioner, and central air conditioning. Later, Cindy heard Blaine walk down the hallway, but did not hear anything else.  At around 7:00 p.m., Cindy received a call from their daughter, Courtney Brown, who told her that she found Blaine "on the porch and [he] wasn't moving."

{¶10}   After Cindy found Blaine on the porch, wearing only boxer underwear and with blood and swelling on his face, she called 911.  Appellee played the 20-minute 43-second 911 call for the jury.  Cindy identified her voice and her daughter's voice on the 911 call.  In the call, Cindy is sobbing and distraught, and says, "My daughter just called.  Somebody beat the hell out of my husband.  He's laying [sic.] on the porch and

he's not breathing . . . There's blood everywhere . . . Oh my God there's blood coming from his head." The 911 operator assisted Cindy with performing CPR and instructed her to pinch her husband's nose and tilt his head.  Cindy replied, "Oh honey, his mouth is full of blood.  There's blood coming out of his nose. There's blood coming everywhere."  The operator advised Cindy to return to chest compressions, and the operator asked if she observed the perpetrator at the property.  Cindy replied, "It's Justin Pennington.  He's walking up the road, my daughter said.  Walking towards Fossil Rock Road."  After Cindy's daughter took over the chest compressions, Cindy said, "Come on Blaine.  Fight, fight . . . I want this guy caught and I want him prosecuted."  Cindy stated, "I was in my room watching TV . . . and then my daughter called and said he was laying [sic.] on the porch not breathing and that Justin Pennington just . . . beat the sh*t out of him."  Cindy continued, "Blood is coming out of his mouth and ears and nose."

{¶11}  Cindy testified that appellant did not visit their home before that day and had no reason to be there.  Cindy also

acknowledged that Blaine consumed whiskey.  After EMS took Blaine in the ambulance, Cindy drove to the hospital and learned that Blaine died.  Cindy testified that the cause of death on the death certificate indicated "blunt force trauma of the head with . . . cardiovascular disease and ethanol intoxication contributing" and listed the manner of death as "homicide" with "multiple strikes to the head."

{¶12}  On cross-examination, Cindy testified that Blaine drank about two half-gallons of whiskey per week, had lost weight, and sometimes drank because he grieved "over his parents and that was how he dealt with it."  Cindy expressed surprise when she learned of methamphetamine in Blaine's system when he died.  Cindy acknowledged that Blaine had a reputation for fighting in his youth, but had never been violent toward her or her family.  Cindy stated that "years before," Blaine told appellant to stay away from their property.

{¶13}  Heather Irwin lives in a camper on Fossil Rock Road. Irwin stated that, in the wintertime, her neighbor, Jim, stays with her "because of the heat."  On June 13, 2021, she drove to

appellant's parents' house because Jim asked her to pick up appellant and his girlfriend, Nia, and bring them to her camper so appellant could help build a fence.  Appellant worked on the fence while Irwin and her friend Nia sat in the sun, had a few drinks, and listened to music.  Irwin stated that she, Nia, and appellant drank "gas station vodka . . . forty-two proof vodka that you find not at the liquor stores."  Irwin drank "not even a fifth of gas station vodka," and she and Nia did not leave the property that day, but appellant did.  "The first time that he left he was talking to Nia and I couldn't overhear, you know, all of it because of the music.  But he said something about avenging her father.  That he was going to go avenge her father."  Irwin did not know what that meant.

{¶14}  After appellant left, Irwin and Nia moved under the awning.  When appellant returned the first time, Irwin "kind of made a joke to him and he apparently must have took it the wrong way.  And he pushed me over in the chair and I scrapped [sic.] my elbow.  Then he kind of picked me up because I was crying, and was like I'm sorry, I'm sorry.  And then he took off again."

{¶15}  Irwin testified that later she and Nia went inside the camper to make a salad.  Nia ate chips and sat near the door while Irwin stood at the kitchen bar when appellant "burst in the door and started screaming and yelling at Nia.  And saying, you know, we've gotta go, we've gotta go and she was like why and he starts grabbing a hold of her hair and dragging her and punching her, you know, throwing stuff around."  Appellant "beat" on Nia and ripped at her clothes.  Irwin picked up a baseball bat she kept for protection and pointed the bat at appellant and screamed "get the hell out of my house."  However, appellant "grabbed the baseball bat out of my hand and proceeded to beat me in the head several times with it."

{¶16}  Irwin lost consciousness and later awoke when her neighbor, Mary Robinson, called 911.  Irwin got up and picked up Nia, "because she's out of it, you now, hurting and bleeding . . . I help[ed] carry [her] down to my neighbor's house across the yard."  After EMS arrived, Irwin spoke with law enforcement and received 5 stitches.  Irwin identified the baseball bat with blood on it.

{¶17}  Nia Robinson testified that she and appellant had an "off and on" relationship for about six years, and he is the biological father of her youngest daughter.  On June 13, 2021, Nia and appellant lived with appellant's parents and his youngest son.  Heather Irwin drove Nia and appellant to Irwin's camper to fix a fence.  Nia testified that she, Irwin, and appellant drank appellant's gas station vodka.

{¶18}  Nia and Irwin eventually went inside the camper and Nia sat in a chair eating chips when appellant entered the camper and "started to beat the shit out of me."  Nia explained that appellant "had a hold of my hair because I could feel my hair being ripped backwards," and appellant hit Nia's face and arms with a bat.  Nia sustained injuries to her face and arm and received stitches.  Nia described Blaine Sharpe as her uncle and stated that appellant left once that day "on foot" to get alcohol.

{¶19}  Mary Robinson testified that on the evening of June 13, 2021, she observed two ambulances travel down Fossil Rock Road, where she resides.  Mary drove to Sargent Road to

investigate and observed EMS at the Sharpe home. After Blaine's daughter told Mary what happened, Mary returned to her property and "went up to [Heather Irwin and Jim Bryant's] to tell them that I wanted Justin Pennington off the property." Mary "found Heather all bloody on the floor and Justin leaning over her mopping her head up with paper towels. And Nia, she was in the camper too but she wasn't as near bloody as what Heather was." Mary "told Justin [she] was going to call the law." Appellant told her, "please don't do that," but Mary "went down home and dialed 911." Mary explained that Irwin and Nia "came down to my house and I spent almost over a half an hour or so mopping blood up from Heather's head. And I didn't think the bleeding was ever going to stop." Mary stayed with Irwin and Nia until the ambulance arrived. Mary acknowledged that both women had been drinking.

{¶20} Athens County Sheriff's Office Lieutenant Jason Kline testified that after the first 911 call at 7:13 p.m., he and Deputy Jason White arrived at the Sharpe home at 7:42 p.m. Kline stated that he observed EMS treat Blaine Sharpe and one

medic told Kline that EMS "were not certain if Mr. Sharpe would actually make it," so Kline contacted his superior to notify him that this could be a homicide.

{¶21} At 7:49 p.m., another 911 call notified dispatch that "two females . . . had possibly been assaulted inside of a camper." Lieutenant Kline instructed Deputy Elson Rouse and Ohio State Highway Patrol Troopers to respond to the other assault on Fossil Rock Road. Kline also overheard a radio call that summoned the coroner to the hospital. Detectives Bryce Fick and John Deak arrived, and once officers secured the scene, Kline drove to the Fossil Rock scene with Rouse.

{¶22} At the Fossil Rock scene, Lieutenant Kline instructed Deputy Rouse to conduct video interviews of the female victims. After Rouse completed the interviews and EMS treated the victims, Kline traveled up Fossil Rock Road to the location where officers "heard something or someone in the woods." Moments after Kline began to search the wood line, appellant "walked out of the wood line and into the field." Officers ordered appellant to stop and walk toward them, but appellant

"laid down in the tall grass in the field." Officers took appellant into custody at 9:32 p.m. and found a "half drank bottle of vodka" in the field.

**{¶23}** Athens County Sheriff's Deputy Jason White testified that on June 13, 2021, he patrolled the area near the Sharpe residence and looked for the suspect. White could not find the suspect, so he drove to the Sharpe home. When Lieutenant Kline directed him to the Fossil Rock Road scene, there he "stood by" with Deputy Rouse. Later, Kline dispatched White about a half mile down Fossil Rock Road, where officers believed they located appellant. By the time White arrived, two troopers had secured appellant and White took appellant into his custody, patted him down, and recovered a wallet and cell phone.

**{¶24}** Deputy White drove appellant to their office and conducted an interview. Appellant told White that before his arrest, "he was with his beautiful wife and kids and they were making barbeque ribs." Appellee played for the jury appellant's statement about (1) why he had been in the woods, (2) why he felt anger toward Blaine Sharpe, and (3) what he did to Sharpe.

On the recording, appellant stated, "So I just went over to Blaine Sharpe's house and I beat the living f*ck out of that guy and laid him . . . on his porch.  Other than that I've not done anything wrong.  I've been working my ass off, dude."

**{¶25}**  Athens EMS Paramedic Kathleen Carrick responded to the Sharpe residence, where she assisted with CPR and helped place Sharpe on a back board.  Carrick performed a halo test "to see what kind of fluid is leaking from the head" because Sharpe "had fluid coming from his ears."  Carrick identified the fluid as cerebral spinal fluid, which meant "that there is more than likely a severe skull fracture."  Carrick stated that EMS began to administer life-saving drugs and "monitored his pulse and respirations, which he did not have at that point.  We tried to incubate [sic.] but he had too many facial fractures."  En route to the hospital, EMS "did get a pulse and a viable rhythm back for about three minutes.  But again the cardiac drugs can do that.  But we lost it pretty quickly."

**{¶26}**  Carrick and her crew also responded to the Fossil Rock Road scene, where she received information that two women "had

been struck with a bat." Carrick worked first with Nia Robinson, who "was not super compliant . . . even admitted to me that she had been drinking. And had a bunch to drink." Nia displayed slurred speech, had a laceration above her eye and an abrasion above her other eye, "was very hysterical," and told Carrick that she had about eight shots and some beer. Nia told Carrick that appellant "hit me with a bat." Nia's injuries concerned Carrick because they could indicate a head injury.

{¶27} Athens County EMS Dillon Burson testified that he treated Heather Irwin, who bled from her forehead. Burson bandaged Irwin and started an IV, but Irwin declined a cervical collar. Irwin informed Burson that appellant struck her with an aluminum baseball bat.

{¶28} Athens County Sheriff's Detective Bryce Fick testified that he and Deputy John Deak arrived at the Sharpe residence at 8:00 p.m. After Deputy White briefed them, Fick photographed the scene and collected potential evidence while Deak traveled to the Fossil Rock Road scene. Later, after Fick advised appellant of his *Miranda* rights, he interviewed appellant and

noticed his right hand appeared "very swollen, potentially broken," also with a cut. Appellee played the interview for the jury and appellant stated:

> I went there and I hit him several times. Yes, I punched him in the face three times . . . See my wrists. I punched him. Then I went to the house right beside him and I said Courtney, which is his daughter. I said 'Courtney, your dad f*cked me out of a lot of money and I hurt him on his porch.'

{¶29} Detective Fick returned to the Irwin residence the following day to photograph and collect several items, including a baseball bat, a broken bowl or plate on the floor, food strewn about the kitchen, a bloody rag or paper towel, and DNA swabs. Fick explained that no DNA or fingerprint results are available because appellant confessed to the Sharpe assault and although officers submitted the items to the lab, "there was ultimately some type of policy issue that I'm not a hundred percent aware of why they were not tested." Fick further testified that, while appellant awaited trial at the Southeast Ohio Regional Jail, on June 7, 2022 the jail recorded a call between appellant and his mother that appellee played for the jury.

{¶30} Detective Fick testified that when he contacted appellant to inform him that Sharpe died and appellee intended to charge appellant with homicide, appellant appeared "shocked" and "very surprised." On cross-examination, Fick acknowledged

that deputies did not stay overnight at Irwin's camper. Fick also explained that officers did not find the baseball bat until the following day, between a chair and the wall, but explained that "we had to look around. I mean if you were doing the quick cursory search you'd probably overlook that easily."

{¶31} Emergency Physician Dr. Robert Holm, Jr. testified that on June 13, 2021, Sharpe arrived with a breathing tube, cervical collar, cardiac monitor, and defibrillator pads. After an EMS briefing, hospital officials used a video laryngoscope (a fiber optic video tool to examine a patient's airway), and staff found "significant blood and debris present within the airway." Staff continued chest compressions and ventilation and administered medications such as Epinephrin to stimulate the heart, "but they were unsuccessful." Medical staff pronounced Sharpe dead at 8:26 p.m. and notified the Coroner's Office. Dr. Holm testified regarding a medical record that indicated "a massive head injury" that Dr. Holm believed to be "non-survivable" between the head injury "and the cardiac arrest."

{¶32} Montgomery County Coroner's Office Forensic Pathologist Dr. Susan Brown testified that she has performed over four thousand autopsies. Brown photographed Sharpe's body, conducted an internal investigation, and evaluated his injuries and medical problems. Brown observed bruises and two

lacerations on Sharpe's left ear lobe, two lacerations behind Sharpe's left ear "with multiple bruises and abrasions or scrapes of skin at the top portion of the left ear," a laceration of Sharpe's upper lip, and bruises around his left eye and left cheek. Brown further documented bruises on Sharpe's right arm near his elbow, an abrasion to his right forearm near his wrist, and multiple bruises and abrasions to his left arm and both hands. Brown observed bruises on Sharpe's chin, "multiple bruises of the scalp on the back of his head," and "multiple large areas of bruising" on both sides of his head, with the left side sustaining more injuries. Overall, Brown observed at least nine distinct injuries to Sharpe's head, which means "[t]here are at least nine distinct blows," and testified that when Sharpe arrived, he "still had blood coming from his, his face and, and ears."

{¶33} Dr. Brown also testified that Sharpe's toxicology report indicated that his system contained "methamphetamine, amphetamine, bubropionephrine, the metabolite for bubropionephrine or the break down product of bubropionephrine, and alcohol." Brown further explained that although Sharpe had a blood alcohol level of ".130 grams percent . . . it is not a drug overdose." Brown's summary listed "blunt force trauma of the head and neck," "blunt force trauma of the torso," and

"blunt force trauma of the extremities." Brown also found "arteriosclerotic cardiovascular disease [coronary artery disease]," "a couple of blockages," and "an enlarged heart." Dr. Brown explained that it is possible that someone with this condition may not know about it. Dr. Brown established blunt force trauma as the "initiating event." Brown explained that some injuries to the head could have occurred with a fall, but noted the "shear [sic.] number of them."

{¶34} Dr. Brown characterized Sharpe's cause of death as "[b]lunt force trauma of the head with arteriosclerotic cardiovascular disease and ethanol intoxication contributing." Brown explained that ethanol intoxication is "not his cause of death. The initiating event of his death is his head trauma. And that coupled with alcohol in his system can cause apnea or it causes you to stop breathing. And that makes your heart more susceptible if you already have coronary heart disease to have cardiac arrest." When asked if the second contributing factor noted as the arteriosclerotic cardiovascular disease caused Sharpe's death, Dr. Brown stated, "[o]nly when it's coupled with the head trauma. So again the head trauma is the initiating event. He is alive and well prior to having head trauma. It's only with the head trauma coupled with these other issues, his heart disease and having alcohol in his system that he dies."

Appellee asked, "but for the blunt force trauma to the head those contributing factors would not have led to the death of Blaine Sharpe?" Dr. Brown replied, "[n]ot on that day."

{¶35} At the close of appellee's case, the trial court denied appellant's Crim.R. 29 motion for judgment of acquittal.

{¶36} Appellant testified that he has three children and acknowledged his criminal history, which includes a 2014 misdemeanor petty theft conviction, a 2018 misdemeanor impersonating an officer conviction, three 2018 receiving stolen property convictions, and a 2019 misdemeanor receiving stolen property conviction. Further, appellant stated that he served a term of probation when this incident occurred.

{¶37} Appellant related that on June 13, 2021, Heather Irwin picked up Nia Robinson and him at appellant's parents' home so appellant could help build a fence around Irwin's pool. During the day, appellant "had a couple of beers" and Heather Irwin and Nia Robinson consumed "gas station vodka." Appellant testified that he did not tell Nia that he planned to "go to Blaine's to avenge something." Appellant stated that Sharpe "lived a couple miles from our family farm" and near Irwin. Appellant stated that he considered Sharpe an acquaintance, that he probably saw Sharpe "two weekends before the incident" and probably visited

Sharpe's garage "a couple of months ago."

{¶38} Appellant stated that "Heather Irwin . . . had carried on all day about how a previous incident happened. And that Blaine was going to come after my father and my son. And I didn't believe it. So after them two had went in the camper, me and the dogs walked down the road to Blaine's to ask him . . . if this was just drunk drama or if this was true." Appellant stated that when no one answered the door at the Sharpe residence, appellant turned to leave when, "Blaine came out of it like a ball of fire. Grabbed me by the throat. I turned and swatted two to three times to get him off of me. And Blaine dropped on his porch." Due to a prior motorcycle accident, appellant's neck is "very, very sensitive . . . for someone's hands to be wrapped around it I feared for it." Appellant stated that he feared bodily injury, and turned and "I guess [used] like a hammer fist two or three times to get him off of me." Appellant stated that Sharpe fell on his back on the porch.

{¶39} Appellant stated that he "didn't know what to do next and I didn't have a phone. So I did the closest thing and went to Courtney Sharpe's, I mean Courtney Brown's house." Appellant stated that he knew Courtney from school, but had not recently been to her home. Appellant knocked on Courtney's door

and "let her know that her dad had come out after me and she needed to go check on him." Appellant stated that he talked to Courtney's husband in the front yard, and when Courtney returned for her phone, appellant "was told" to leave.

{¶40} Appellant returned to Heather Irwin's property via a shortcut through the woods. Appellant stated, "I opened the door to the camper to find Nia Robinson on the floor of the camper." While appellant checked on Nia, Heather Irwin "comes out of the room with a ball bat screaming some dumb sh*t, I don't even know what she's saying. Swinging the ball bat, hitting the ball bat, everything else. And while I'm trying to get Nia shaken up Heather cracks me several times in the back and the back of the head with a ball bat." Appellant stated that he "asked her several times not to and after doing it again I stood up and I punched Heather right in the face." Appellant did not know what happened with the bat, but "the first thing I did was grab a roll of paper towels, try to calm her down and put it to her head because it was bleeding." At that point, Mary Robinson "was standing in the doorway, and I asked her I said would you please f*cking help me with these two. And she said, no, f*ck that sh*t, I'm calling the cops on them. And took off on me. And she told me to get the f*ck off the property because Pat didn't want me there. Pat's the owner of

the property."

{¶41} Appellant stated that he "was stressed the f*ck out, [and] grabbed a full bottle of vodka by the door, walked around in the field behind the camper and set down at the edge of the woods" and "drank about half of it." After he observed law enforcement looking for him, appellant "hollered for them to let them know where I was at." Appellant explained that law enforcement told him to come towards them, "but being dark and me not being as much of a drinker drinking a half a bottle of vodka last f*cking thing I was going to do was walk toward a bunch of Athens County Sheriff's Officers with guns." Appellant "yelled to let them know I was walking in the field." Appellant then laid down in the field and waited for officers "to come to me."

{¶42} Appellant testified that officers handcuffed and transported him to the Athens County Sheriff's Department where two detectives interviewed him, but he did not remember much because "I was lit [impaired]. I was gone." Appellant stated that when officers told him Sharpe had died, "it was tough, it was very tough . . . because it was a friend's dad and I've known him my whole f*cking life. I didn't believe it."

{¶43} On cross-examination, appellee reviewed appellant's convictions, which included multiple identity fraud and receiving stolen property convictions. Appellant also claimed that he did not believe his previous employer fired him for stealing a credit card. Appellant did acknowledge that Sharpe did not get up from the porch after the incident.

{¶44} Appellee asked appellant if he recalled a June 7, 2022 jail phone call with his mother in which he stated, "if anything it was just a punch in the f*cking mouth and tell me to leave my family out of it. That's all I had planned." Appellant testified that he assaulted Sharpe "to defend myself." In the call, appellant stated, "I lost it, no f*cking way, I don't know, inner demon, I'll have to pay for it the rest of my life." Appellant also acknowledged that he stated that he wished that Heather Irwin "had to get thirty stitches instead of twelve" because he "had a lot of hate toward that direction . . . after it had happened . . . because I'd seen, I'd heard what she'd done to Nia."

{¶45} Appellant conceded that, after he watched his interview with Deputy White, he realized he told White, "I could have f*cking killed him." Appellant also claimed that when he walked to Courtney's house to tell her what happened, he

informed her that "I went to her Dad's to talk to him because my mother was getting custody of my child and I didn't need no drama or cops at my house. That's what I said." Appellant also acknowledged that in his statement to Deputy White, he said that Blaine Sharpe had called police "up to [his] parent's house," and his parents are his "ride or die" and "it's effecting [sic.] your kid's custody." Appellee asked appellant whether he stated during the interview that Sharpe owed him $1,300 for methamphetamine, and appellant replied that he had "no clue why" he said that because he has "been clean for two months." Appellant also claimed that Sharpe "beat his ex-father-in-law [Nia's father] with a chunk of firewood." Appellee also asked appellant if he told law enforcement that he visited the Sharpe home that day because "Blaine had disrespected [him]" his whole life, but appellant replied, "Not to my knowledge."

{¶46} Appellant testified that when Sharpe put his hands around his throat from behind him, appellant "punched two to three" times "like a hammer fist," and described it as "two of the gayest punches." Appellant claimed that after Sharpe fell, he did not continue to beat him, but instead walked to Sharpe's daughter's house. When asked if he broke his hand when he struck Sharpe, appellant claimed that the injury to his hand

occurred when Heather Irwin struck him with a bat on his hand, back, and several other places. Appellant also acknowledged that he told the Sheriff's Office that he "beat the living f*ck out of [Sharpe]." Appellant maintained that law enforcement did not interview him about the Irwin and Robinson assaults. Appellant also acknowledged that he told officers he did not return to the camper after the Sharpe incident. Appellant stated, "[t]here's no way I hit that man hard enough to do that. There's not." Finally, appellant acknowledged that on June 13, 2021, his probation conditions did not permit him to consume alcohol.

{¶47} After deliberation, the jury found appellant guilty of (1) one count of murder in violation of R.C. 2903.02(B), an unclassified felony, (2) one count of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony, (3) one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony (Blaine Sharpe), (4) one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (Heather Irwin), and (5) one count of breaking and entering in violation of R.C. 2911.13(B), a fifth-degree felony. The jury also found appellant not guilty of (1) one count of burglary in violation of R.C. 2911.12(A)(2), a second-degree felony (Count 3), and (2) one count of felonious assault in

violation of R.C. 2903.11(A)(2), a second-degree felony (Count 6, Nia Robinson).

{¶48} After the trial court considered the pertinent sentencing statutes and factors, the court sentenced appellant to (1) serve a maximum term of 15-years to life on count one murder, (2) serve an 8-12 year prison term for count five felonious assault, consecutive with count one, (3) serve a 12-month prison term for count seven, concurrently with count one (merged) and count five, (4) serve an 18-month to 5-year postrelease control term, (5) reimburse appellee for processing, supervision, confinement, indigent attorney fees and prosecution costs, (6) serve the term in this case consecutive to appellant's prison term in case numbers 18CR0370, 18CR0484 and 18CR0537, (7) register as a violent offender pursuant to R.C. 2930.41, and (8) pay costs. Thus, the trial court sentenced appellant to serve a total aggregate prison term of 23 years to life. The trial court also merged Counts 1, 2, and 4, and appellee elected to sentence on Count 1. This appeal followed.

I.

{¶49} In his first assignment of error, appellant asserts that the trial court violated his rights under the United States and Ohio Constitutions when it improperly admitted a 911 call.

Appellant contends that the danger of unfair prejudice outweighed the limited probative value of Cindy Sharpe's 911 call. Appellee, however, argues that the 911 call (1) is a nearly contemporaneous recording of the lifesaving efforts undertaken to reverse the damage appellant caused to the victim, (2) shows the level of harm caused, (3) is probative of the cause of death, and (4) shows that Courtney Brown and Cindy Sharpe's efforts to save the victim's life undercut appellant's claims that something beyond appellant's assault caused the victim's death.

{¶50} Generally, " '[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' " *State v. Dean*, 2015-Ohio-4347, ¶ 91, quoting *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Consequently, "a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice." *State v. Morris*, 2012-Ohio-2407, ¶ 14, quoting *State v. Diar*, 2008-Ohio-6266, ¶ 66; *accord State v. Adams*, 2015-Ohio-3954, ¶ 198, citing *Sage*, 31 Ohio St.3d at 182 (1987). "An abuse of discretion is more than a mere error of law or judgment." *State v. Thompson*, 2014-Ohio-4751, ¶ 91; *accord State v. Johnson*, 2015-Ohio-4903, ¶ 75. Instead, " '[a]

trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary.' " *State v. Keenan*, 2015-Ohio-2484, ¶ 7, quoting *State v. Darmond*, 2013-Ohio-966, ¶ 34. An abuse of discretion includes a situation in which a trial court did not engage in a " 'sound reasoning process.' " *Morris*, *supra,* at ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp*., 50 Ohio St.3d 157, 161 (1990). Moreover, "[a]buse of discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Darmond* at ¶ 34; *State v. Russell,* 2022-Ohio-1746, ¶ 76 (4th Dist.).

{¶51} As a general rule, all relevant evidence is admissible. Evid.R. 402. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401 and Evid.R. 402. However, a trial court must exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403. A trial court has broad discretion to determine whether to exclude evidence under Evid.R. 403(A), and " 'an appellate court

should not interfere absent a clear abuse of that discretion.' " *State v. Yarbrough*, 2002-Ohio-2126, ¶ 40; *accord Russell, supra,* at ¶ 77.

{¶52} Evid.R. 403(A) "manifests a definite bias in favor of the admission of relevant evidence, as the dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value before the court should reject its admission." *State v. White*, 2004-Ohio-6005, ¶ 50 (4th Dist.). Thus, "[w]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2007-Ohio-325, ¶ 22 (2nd Dist.).

{¶53} In *Russell,* 2022-Ohio-1746, we recognized that, to some degree, all relevant evidence may be prejudicial because it "tends to disprove a party's rendition of the facts" and, thus, "necessarily harms that party's case." *Id.,* citing *State v. Crotts*, 2004-Ohio-6550, ¶ 23. However, Evid.R. 403(A) does not "attempt to bar all prejudicial evidence." *Crotts* at ¶ 23. Instead, the rules provide that only unfairly prejudicial

evidence is excludable. *Id.* " 'Evid.R. 403(A) speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits.' " *State v. Skatzes*, 2004-Ohio-6391, ¶ 107, quoting *State v. Wright*, 48 Ohio St.3d 5, 8 (1990).

**{¶54}** The Supreme Court of Ohio has held that " '[u]nfair prejudice' does "not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." ' " *State v. Lang*, 2011-Ohio-4215, ¶ 89, quoting *United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993). Unfairly prejudicial evidence is evidence that "might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3. It is evidence that arouses the jury's emotions, that " 'evokes a sense of horror,' " or that " 'appeals to an instinct to punish.' " *Id.* " 'Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' " *Id.* Thus, "[u]nfavorable evidence is not equivalent to unfairly prejudicial evidence." *State v. Bowman*,

144 Ohio App.3d 179, 185 (12th Dist.2001).

{¶55} In the case sub judice, appellant contends that "almost nothing" in the 911 call tended to prove any fact of consequence, and characterizes the call as "extremely emotional and entirely irrelevant." The approximately 20-minute call from Blaine Sharpe's spouse portrayed an emotional wife distraught over her husband's condition, evidence of the extraordinary lifesaving measures Sharpe and Brown took to attempt to save the victim, and identified appellant as the perpetrator.

{¶56} Although appellant challenges the 911 call under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution, the Eighth District Court of Appeals recently discussed the nature of a 911 call with respect to the Confrontation Clause and noted:

> Statements a caller makes during a 911 call are often found to be non-testimonial and are admissible if the statements satisfy a hearsay exception. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 61 (8th Dist.). This is because a 911 caller is typically "speaking about events as they [are] actually happening" and "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are usually facing ongoing emergencies. (Emphasis deleted.) *Davis* at 827, 126 S.Ct. 2266 ("A 911 call * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances

requiring police assistance."). Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness and the statements of the 911 caller are not testimonial in nature. *Id.* at 827-828, 126 S.Ct. 2266.

{¶57} Moreover, in *State v. Shine-Johnson*, 2018-Ohio-3347 (10th Dist.), the prosecutor played for the jury a daughter's 911 call, which contained the statement, " '[o]h, my God' multiple times, that she was scared, and that there was too much blood, '[t]his is my dad' and 'this is my daddy,' pleads for medics to hurry, and crying." *Id.* at ¶ 105. The defendant argued that the State played the call only to appeal to the jury's emotions. The Tenth District concluded that the defendant did not show that the prosecutor improperly sought to incite emotion or sympathy when it played the 911 call. Instead, the court determined that its use "was reasonably calculated to assist the jury in understanding the sequence of events and in evaluating the evidence." *Id.* at ¶ 107.

{¶58} Further, appellee highlights a recent Supreme Court of Ohio case in which an officer's body camera video showed his arrival at the scene, approach to the victim's house, confirmation of the defendant's location, initial communication with the victim, safety check of the backyard, and participation in moving two victim's bodies to the front yard. *State v.*

*Nicholson,* 2024-Ohio-604, ¶ 127. The footage also showed the officer trying to speak to one victim and his attempts to perform cardiopulmonary resuscitation (CPR) for about five minutes. The video showed the second victim "twisting and moaning in pain," and jurors could hear an officer in the background state that Nicholson "was beating [a third victim] up and her kids came home," that "he opened fire on them," and that victim had "marks all over her." *Id.* at ¶ 128. Later, the officer stated that Nicholson said he would shoot any officer who responded to the scene. *Id.* The court noted that the video "shows part of M.L.'s torso up close, including the exit wounds in his chest. Combined with the audio, the footage of the CPR efforts is emotionally taxing to watch because Polanco is audibly distraught in the background." *Id.* at ¶ 129.

{¶59} The *Nicholson* court described the body-camera video as relevant and highly probative of the nature and circumstances of the murders. The court noted that the footage "depicted the scene as it was found by the earliest responding officers, including the vital statuses and location of the murder victims." *Id.* at ¶ 131. Thus, the court affirmed the trial court's decision to admit the video footage.

{¶60} In the case sub judice, the distraught wife's sobs could characterize the 911 call as "emotionally taxing." However, unlike *Nicholson,* this case involved no video. Moreover, as appellee notes, appellant cites no authority to support this argument in similar circumstances. At trial, appellee asserted that, because appellant challenged the cause of death, the 911 call is "the best evidence as to what was going on at the Sargent Road address from the time that they discovered him until the time that EMS arrived." The trial court overruled appellant's objection and allowed appellee to play Sharpe's entire 911 call. As the *Nicholson* court recently held, "[t]he state is entitled to offer evidence showing the cause of death, even if the cause of death is uncontested, to give the jury an 'appreciation of the nature and circumstances of the crimes.' " *Id.* at ¶ 130, quoting *State v. Evans*, 63 Ohio St.3d 231, 251 (1992).

{¶61} In addition, appellant asserts that the 911 call is not harmless beyond a reasonable doubt when the other evidence of guilt is "less than overwhelming." As appellee argues, however, appellant cited no authority to indicate that any court reversed a conviction based on an erroneous admissibility decision similar to that now before this court. Moreover, in

the case sub judice the evidence of guilt is hardly "less than overwhelming." Here, multiple witnesses identified appellant as the person who assaulted Blaine Sharpe. Appellant, himself, told Sharpe's daughter that he "had just beat the pulp out of [her] Dad." Further, appellant stated in various law enforcement interviews that he "went over to Blaine Sharpe's house and I beat the living f*ck out of that guy," "I went there and I hit him several times. Yes, I punched him in the face three times . . . See my wrists. I punched him. Then I went to the house right beside him and I said Courtney, which is his daughter. I said, 'Courtney, your dad f*cked me out of a lot of money and I hurt him on his porch." In addition, in recorded jail calls to his mother, appellant stated, "I lost it, no f*cking way, I don't know, inner demon, I'll have to pay for it the rest of my life." Further, appellant had blood on his stomach upon his arrest.

{¶62} Therefore, after our review, we find no abuse of discretion when the trial court admitted into evidence Cindy Sharpe's 911 call, and we overrule appellant's first assignment of error.

## II.

{¶63} In his second assignment of error, appellant asserts

that the trial court violated his cross-examination rights when it limited counsel's cross-examination of a victim that the court permitted to remain in the courtroom during other testimony pursuant to Marsy's Law.

{¶64} Evid.R. 615(A) provides that "at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . ."  However, Evid.R. 605(B)(4) states that "an alleged victim of a charged offense" may not be excluded "to the extent that the alleged victim's presence is authorized" by statute or the Ohio Constitution.

{¶65} Article I, Section 10a of the Ohio Constitution, commonly referred to as Marsy's Law, expanded the rights afforded to victims of crime.  Marsy's Law is intended "[t]o secure for victims justice and due process throughout the criminal and juvenile justice systems."  It affords crime victims certain rights that are to be "protected in a manner no less vigorous than the rights afforded to the accused ....."  Ohio Constitution, Article I, Section 10a (A).  These rights include, but are not limited to, the right "to be treated with fairness and respect for the victim's safety, dignity and privacy," as well as the right "to be heard in any public

proceeding involving release, plea, sentencing, disposition, or parole, or in any public proceeding in which a right of the victim is implicated ....'' *Id.,* Ohio Constitution, Article I, Section 10a (A)(3); *State v. Norvell,* 2024-Ohio-4443, ¶ 28 (12th Dist.), and "reasonable and timely notice of all public proceedings involving the criminal offense or delinquent act against the victim, and to be present at all such proceedings.'' *Id.,* Ohio Constitution, Article I, Section 10a (A)(2) and (3).

{¶66} In pertinent part, Marsy's Law provides victims the right, "upon request, to reasonable and timely notice of all public proceedings involving the criminal offense * * * and to be present at all such proceedings.'' Ohio Constitution, Article I, Section 10a(A)(2). "While Marsy's Law incorporates the victim's right to be present at trial into the Ohio Constitution, 'the notion that a victim may remain present during the trial proceedings is not new.' '' *Grandview Hts. v. B.S.H.,* 2023-Ohio-940, ¶ 9 (10th Dist.), quoting *Cleveland v. Alrefaei*, 2020-Ohio-5009, ¶ 57 (8th Dist.); *State v. Davis,* 2023-Ohio-3012, ¶ 7 (3d Dist.). R.C. 2930.09, as effective at the time of the trial, states that "[a] victim . . . in a case . . . have the right to be present, during any public proceeding, other than a grand jury proceeding.''

{¶67} Generally, a decision to allow a victim to remain in the courtroom during a trial is left to the trial court's discretion. The burden is on the defendant to show that the alleged victim's presence compromised the defendant's right to a fair trial. *Alrefaei, supra,* at ¶ 60; *State v. McConnaughey,* 2021-Ohio-3320, ¶ 26 (1st Dist.).

{¶68} In the case sub judice, at the start of appellant's trial, appellant requested a separation of witnesses. The trial court, however, denied the motion as to three of the four witnesses because Marsy's Law entitled them to be present. During Nia Robinson's cross-examination, counsel told Robinson to "speak up." After Robinson agreed, counsel asked, "Do you remember me telling Heather [Irwin] that?" Robinson replied, "I do." Counsel then said, "Ok and that's because you've been in the room the entire time and seen all the testimony?" Appellee objected and noted during the bench conference that Robinson "has a Constitutional right to be present. And it's not right that Cross Examination of the fact that she's aloud [sic.] to be in a room." Appellee suggested that the court inform the jury that the victim "has a Constitutional right to be in the room like the Defendant does." In response, counsel stated, "We needed the statement since we opened the door on this line of

questioning by allowing that they have been in the Courtroom." The trial court sustained the objection, and counsel continued his thorough cross-examination of Robinson, which continued for 23 pages of the transcript.

{¶69} Appellant claims that this action violated his right to cross-examination under the Sixth Amendment to the United States Constitution through the Fourteenth Amendment and Article I, Section 10 of the Ohio Constitution. Appellant contends that although Marsy's Law grants victims a state constitutional right to be present during all proceedings, "that does not trump a defendant's federal constitutional rights." Appellant contends that, without respect to Marsy's Law, trial courts are required to exclude the victim if the victim's presence would deprive the defendant of a fair trial. Appellant cites R.C. 2930.09, *Alrefai,* and *McConnaughey*. Appellant contends that a victim's right to be present under Marsy's Law does not insulate them from cross-examination on what they heard and how they may be tailoring their testimony to fit the other evidence.

{¶70} In the case sub judice, we find nothing in the record to show that the trial court failed to consider appellant's right to a fair trial. Moreover, even if we accept for purposes of argument that the trial court may have erred, we believe that

under the circumstances present here that it is harmless because appellant failed to demonstrate prejudice. Courts have held that "for a defendant to show that a victim's presence would result in an unfair trial, [the defendant] must present particularized evidence that the victim's testimony will be so affected by the victim's presence during the testimony of the other witnesses that [the defendant's] right to a fair trial would be violated. General assertions that it is possible are insufficient." *McConnaughey* at ¶ 29, quoting *State v. Maley*, 2013-Ohio-3452, ¶7; *accord Alrefaei* at ¶ 63.

{¶71} In *McConnaughey*, the court held that, because the victims' testimony did not dramatically differ from their statements to police, the defendant received a fair trial. Moreover, defense counsel cross-examined both victims to determine the veracity of each victim's testimony. *Id.* at ¶ 30. Thus, the court held that McConnaughey did not demonstrate the necessity to exclude victims and it could not find the trial court's decision to allow the victims to remain in the courtroom to be so arbitrary, unreasonable or unconscionable as to constitute an abuse of discretion. *Id.* Similarly, we conclude that the trial court's decision in the instant case to allow Nia Robinson to remain present in the courtroom during the trial and

then testify is not so arbitrary, unreasonable or unconscionable as to constitute an abuse of discretion.[2]

{¶72}  In addition, appellant questions victim Heather Irwin's presence throughout the trial and the lack of cross-examination regarding what she may have heard from other witnesses.  Appellant argues that this error is not harmless beyond a reasonable doubt because (1) the evidence of guilt relating to Irwin's assault "was not overwhelming" because the sole evidence came from Irwin, who had been drinking that day,

---

[2] In *State v. Montgomery*, 2022-Ohio-2211, the Ohio Supreme Court held that the designation of an alleged rape victim as the state's representative, and permitting the victim to sit at counsel table throughout the trial, undermines the fairness of the fact-finding process and erodes a defendant's presumption of innocence.  However, the situation in the case sub judice differs from *Montgomery*.  Here, the witnesses remained in the courtroom, but did not sit at counsel table.  Nevertheless, concerns certainly arise regarding the tension between the rights of victims of crime and the rights of criminal defendants to receive a fair trial.  The long-standing practice of separating witnesses, to prevent both the prosecution and defense witnesses from hearing other witness testimony, and then possibly adjusting or tailoring their testimony to conform the testimony of other witnesses, does create a condition that could undermine the fairness of a criminal trial.  Consequently, the practice of separating witnesses during a trial should not necessarily be considered an affront to the rights of victims to be involved in the criminal process.  Moreover, witnesses who have already testified will generally be permitted to remain in the courtroom if they so choose.  In the case sub judice, however, the evidence adduced at trial is so overwhelming that the jury's verdict and the outcome of the trial would not change.

(2) officers found the baseball bat the following day and failed to preserve any fingerprints or DNA to tie appellant, Irwin, or Nia to the bat, (3) Irwin's "story was contradicted by other witnesses," and (4) Nia's testimony "was broadly supportive" of Irwin and "echoed Heather's claims" of appellant's violence.

{¶73} First, we note that a detailed cross-examination of Heather Irwin about what she may have heard during her presence at trial seems pointless given that the jury could presume that Irwin heard the same testimony they heard during the trial. Moreover, appellee notes that appellant (1) did not object to Irwin or Robinson's presence during trial, (2) fails to demonstrate how either victim's testimony would have been different had they been excluded from the courtroom during other witness testimony, and (3) fails to establish how Marsy's Law limited cross-examination in a prejudicial manner.

{¶74} The Ohio Constitution allows victims to be present during all stages of the proceeding and here we believe that appellant failed to establish that he suffered any prejudice. As for gauging inconsistencies between witnesses, "because a trier of fact sees and hears the witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations." *State v. Schroeder*, 2019-

Ohio-4136, ¶ 61 (4th Dist.)*; State v. Colonel*, 2023-Ohio-3945, ¶ 50-54 (4th Dist.); *State v. Shepard,* 2024-Ohio-1408, ¶ 37.

{¶75} In the case sub judice, appellant does not point to any particularized evidence in the record to demonstrate that the trial court's action affected the jury or tainted their verdict when it permitted Irwin and Robinson to be present and testify at trial. Thus, we conclude that the trial court's decision to allow the victims to be present and testify is not so arbitrary, unreasonable or unconscionable as to constitute an abuse of discretion.

{¶76} Therefore, based on the foregoing reasons we overrule appellant's second assignment of error.

III.

{¶77} In his third assignment of error, appellant asserts that appellee failed to present sufficient evidence to prove beyond a reasonable doubt that appellant's actions proximately caused the victim's death. In particular, appellant argues that Blaine Sharpe's death "was not a reasonably foreseeable consequence" of the assault because of Blaine's "severe heart condition and intoxication." Appellee, however, contends that Sharpe "was not fragile, frail, elderly, or suffering a heart attack," nor did he "die of alcohol poisoning or a drug

overdose," and his clogged arteries did not bring about his death.

{¶78} In general, a claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Schroeder*, 2019-Ohio-4136, ¶ 59 (4th Dist.), citing *State v. Blanton*, 2018-Ohio-1278, ¶ 13 (4th Dist.); *State v. Wickersham*, 2015-Ohio-2756, ¶ 22 (4th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380 (1997). When reviewing the sufficiency of the evidence, adequacy is the focus; that is, whether the evidence, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. *Thompkins*, syllabus.

{¶79} The standard of review for an appellate court in an evidence sufficiency inquiry is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991); *State v. Beasley*, 2018-Ohio-493, ¶ 207. Further, an assignment of error based on sufficiency of the evidence

challenges the state's prima facie case's legal adequacy, not its rational persuasiveness. *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.). Therefore, when an appellate court reviews a sufficiency of the evidence claim, the court must construe the evidence in a light most favorable to the prosecution. *State v. Dunn*, 2017-Ohio-518, ¶ 13 (4th Dist.); *Wickersham, supra*, ¶ 23; *State v. Hill*, 75 Ohio St.3d 195, 205 (1996). Consequently, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds cannot reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001).

{¶80} In the case sub judice, in addition to one count of involuntary manslaughter, two counts of felonious assault, and one count of breaking and entering, the jury found appellant guilty of felony murder in violation of R.C. 2903.02(B), which provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not [voluntary or involuntary manslaughter]." Felonious assault, R.C. 2903.11, can serve as a predicate offense for a felony-murder charge. A person commits felonious assault when one "knowingly" causes "serious physical

harm to another. . ."  R.C. 2903.11(A)(1).  "[T]aken together, a person commits felony murder with a felonious-assault predicate when he or she knowingly causes serious physical harm to another and that conduct is the proximate cause of another's death." *State v. Owens,* 2020-Ohio-4616, ¶ 9.

**{¶81}**  Appellant contends that appellee failed to present sufficient evidence to show that appellant's actions proximately caused Sharpe's death.  In particular, appellant argues that no evidence established that appellant knew about Sharpe's severe heart condition and intoxication and, from appellant's viewpoint, "Blaine was a perfectly healthy person who should not have died from a punch to the head."  Appellant cites *State v. Smith*, 2007-Ohio-1884 (4th Dist) in support of his argument.  In *Smith*, the victim, a person with diabetes, died after Smith struck him once in the head, and the victim stopped taking his medication. *Id.* at ¶ 1.  We held:

> Prior to death, his blood sugar levels were extremely elevated and his bowels had become necrotic. Thus, Smith contends unforeseeable intervening events caused Biser's death. However, based on the testimony from the State's two expert witnesses, a reasonable juror could conclude that Smith's punch and Biser's resulting fall damaged the frontal lobes of Biser's brain. As a normal result of these injuries, Biser became apathetic and disinterested, which in turn, led to his failure to take required medication, and ultimately his death. Biser's lapse in attending to his own care was a response to Smith's assault. Because it was neither unforeseeable

nor abnormal, it cannot be an intervening cause that
broke the chain of legal causation stemming from the
assault.

*Id.*

In our view, *Smith* tends to support appellee's position that

Sharpe's death was a foreseeable, normal consequence of

appellant's assault.  In *State v. Pinkerman,* 2024-Ohio-1150 (4th

Dist.), we recently addressed causation as it relates to

involuntary manslaughter.  We wrote:

> In criminal cases, Ohio law generally defines "cause"
> identically to the definition of "proximate cause" in
> civil cases. *See, e.g., State v. Emerson*, 2016-Ohio-
> 8509, 78 N.E.3d 1199, ¶ 24 (2d Dist.).  *See also State
> v. Jacobs*, 8th Dist. Cuyahoga No. 51693, 1987 WL 10047,
> *2 (Apr. 23, 1987)("It is merely a matter of semantics
> that criminal cases are 'cause' and 'result' and civil
> cases use 'proximate cause' and 'proximate result.' They
> mean the same thing. In fact, R.C. 2903.04 (Involuntary
> Manslaughter) uses 'proximate result' to state the
> offenses."); *State v. Tschuor*, 3d Dist. Auglaize No. 2-
> 77-31, 1978 WL 215783, *2 (Oct. 17, 1978)(proximate-
> cause theory of criminal liability is applicable
> standard under Ohio's involuntary-manslaughter
> statute); *State v. Carpenter*, 2019-Ohio-58, 128 N.E.3d
> 857, ¶ 51 (3d Dist.).

> "  'The term "proximate result" in the involuntary
> manslaughter statute involves two concepts: causation
> and foreseeability.' "  *Potee*, 2017-Ohio-2926, 90 N.E.3d
> 58, at ¶ 33, quoting *State v. Hall*, 12th Dist. No.
> CA2015-11-022, 2017-Ohio-879, ¶ 71. In *Brown*, 3d Dist.
> Hancock No. 5-17-19, 2018-Ohio-899, the court considered
> the argument that sufficient evidence did not support an
> involuntary manslaughter conviction based on a predicate
> offense of corrupting another with drugs. The appellate
> court concluded: "Since we have found Brown's arguments

against his conviction for corrupting another with drugs are without merit, his conviction for involuntary manslaughter has a properly supported predicate conviction and withstands the sufficiency of the evidence analysis." *Id.* at ¶ 30.

*Pinkerman, supra,* at ¶ 37-38.

{¶82} In *Pinkerman,* we cited the Third District's analysis in *Carpenter:*

> There are several tests for actual causation, the most common of which is the "but for" test; however, there are circumstances under which the "but for" test is inapplicable and an act or omission can be considered a cause in fact if it was a "substantial" or "contributing" factor in producing the result. *See Hall* at ¶ 72-73; *Emerson* at ¶ 24; *Burrage* at 215, 134 S.Ct. 881; *Christman* at 755, 249 P.3d 680. *See also State v. Wilson*, 10th Dist. Franklin No. 03AP-592, 2004-Ohio-2838, 2004 WL 1221748, ¶ 18 ("The injuries inflicted by the defendant need not be the sole cause of death, as long as they constitute a substantial factor in the death."), citing *State v. Johnson*, 60 Ohio App.2d 45, 52, 395 N.E.2d 368 (1st Dist.1977) ("In homicide cases involving the effect of expert medical testimony as to the cause of death, the general principle is that the injury need not be proved to be the direct or sole cause of death, as long as it started a chain of causation which resulted in or substantially contributed to the death."), aff'd, 56 Ohio St.2d 35, 40-41, 381 N.E.2d 637; *Johnson*, *Cause-In-Fact After Burrage v. United States*, 68 Fla.L.Rev. 1727, 1747 (2016) (highlighting Ohio as one of the jurisdictions that does not follow the "but-for" test to establish cause-in-fact causation), citing *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E.2d 643 (1995). "In other words, a defendant can still be held criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury." *Hall* at ¶ 72. *See also Emerson* at ¶ 24 (noting that "an offender's criminal act does not have to be the sole cause of harm"); *State v. Dunham*, 5th Dist. Richland No. 13CA26, 2014-Ohio-1042, 2014 WL 1340627, ¶ 48 (asserting

that "there may be more than one proximate cause of an injury" and, to satisfy the causal requirement, cause in fact may be established by proof "that the conduct is a substantial factor in bringing about the injury").

The second component of causation—the legal or "proximate" cause—refers to the foreseeability of the result. *See* Katz, Martin, & Macke, Baldwin's Ohio Practice, Criminal Law, Section 96:4 (3d Ed.2018). *See also Hall* at ¶ 71; *State v. Bacon*, 6th Dist. Lucas No. L-14-1112, 2016-Ohio-618, 2016 WL 698033, ¶ 83 ("Proximate cause has been defined as ' "a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience." ' "), quoting *State v. Burt*, 8th Dist. Cuyahoga No. 99097, 2013-Ohio-3525, 2013 WL 4137378, ¶ 23, quoting *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, 2003 WL 22455703, ¶¶ 26-27; *Nere*, 425 Ill.Dec. at 652, 115 N.E.3d 205, 2018 WL 4501039, at *7 (proximate cause "means that the result that actually occurs 'must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result.' "), quoting 1 LaFave at 630-31. A " 'defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of risk created by his conduct.' " *State v. Sabo*, 3d Dist. Union No. 14-09-33, 2010-Ohio-1261, 2010 WL 1173088, ¶ 25, quoting *State v. Losey*, 23 Ohio App.3d 93, 95, 491 N.E.2d 379 (10th Dist.1985). " '[T]hat means that death [or serious physical harm] reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances.' " *Id.*, quoting *Losey* at 95, 491 N.E.2d 379.

*Id.* at ¶ 52-53.

{¶83} Morever, in *State v. Johnson*, 2014-Ohio-4443 (4th

Dist.), we discussed the element of causation in the context of independent intervening events.  A jury found Johnson guilty of felonious assault of a corrections officer, Meier.  After being transported for treatment, doctors diagnosed Meier with a head injury, headaches, and sprains, and he required shoulder surgery.  At trial, Meier testified he had not been back to work, could not sleep, and suffered debilitating headaches.  On appeal, Johnson argued that, although he hit the officer in the face, "the injuries to the shoulder and head were not from the punch but from the melee which ensued when other prison officers got involved."

{¶84}  In *Johnson,* we observed that the defendant unquestionably set the sequence of events into motion when he punched the victim in the head.  "The jury could have reasonably inferred from those punches themselves that Johnson had caused serious physical harm to Meier resulting in his closed head injury and recurring debilitating headaches."  *Johnson* at ¶ 19.  Thus, we concluded that (1) Johnson "could have reasonably foreseen that his unprovoked inmate attack on a prison guard would result in the guard he assaulted and other guards following prison protocol by attempting to restrain him by

taking him down to the ground," and (2) that the victim's injuries "were consequently reasonably foreseeable to Johnson and they would not have occurred if Johnson had not started the altercation by punching Meier." *Johnson* at ¶ 20.

{¶85} " 'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *Johnson* at ¶ 18, quoting *State v. Conway*, 2006-Ohio-791, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.3d 35, 39 (1978); *State v. Champlin*, 2014-Ohio-1345, ¶ 22 (11th Dist.); *State v. Mynes*, 2013-Ohio-4811, ¶ 17 (4th Dist.). "[T]he jury, unable to enter the mind of another, is required to consider common sense, causal probabilities in considering whether the defendant acted 'knowingly.' " *State v. Kelly*, 2012-Ohio-523, ¶ 23 (11th Dist.). *See also Underwood*, 2024-Ohio-2273, ¶ 91 (4th Dist.) (although pathologist observed effects of aspiration pneumonia in the victim's lungs, pathologist opined that blunt force injury to victim's head caused his death because "there were no independent intervening causes of death after the traumatic brain injury."); *State v. Jennings*, 2009-Ohio-6840, ¶ 51 (10th Dist.)(victim's death reasonably foreseeable consequence of defendant's aggravated robbery offense).

{¶86} In the case sub judice, Forensic Pathologist Dr. Susan Brown testified that the victim's cause of death "was blunt force trauma of the head with arteriosclerotic cardiovascular disease and ethanol intoxication contributing." Dr. Brown explained, "[t]he initiating event of his death is his head trauma. And that coupled with alcohol in his system can cause apnea or it causes you to stop breathing. And that makes your heart more susceptible if you all ready have coronary heart disease to have cardiac arrest." Brown emphasized, however, that appellant's "death is not due to a drug overdose." Further, Brown clarified that the arteriosclerotic cardiovascular disease contributed to Sharpe's death "only when it's coupled with the head trauma. So again the head trauma is the initiating event. He is alive and well prior to having head trauma. It's only with the head trauma coupled with these other issues, his heart disease and having alcohol in his system that he dies." When asked, "so but for the blunt force trauma to the head those contributing factors would not have led to the death of Blaine Sharpe?," Brown replied, "Not on that day."

{¶87} Appellant contends that some case authority requires a defendant to have prior "actual notice" of the underlying conditions that ultimately contribute to the victim's death, and

cites *State v. Nosis*, 22 Ohio App.2d 16 (9th Dist. 1969). However, in *Nosis* the defendant approached the victim's window during a road rage incident and "wanted him to fight." The victim's wife told the defendant to leave her husband alone because he "had a bad heart." After the defendant followed the couple several miles to their home and approached and cursed at the victim a second time, the victim also told the defendant that he had a bad heart. While the victim's wife ran inside to call for help, she looked out and saw her husband lying in the driveway after he suffered a heart attack. *Id.* at 17-18. The victim's doctor testified that the victim suffered from arteriosclerotic heart disease and he advised him to retire. Further, the doctor testified that these events "with reasonable certainty were responsible for" the victim's death. *Id.* at 19-20. The court upheld the manslaughter conviction. *Id.* In our view, *Nosis* focused on proximate cause, not whether the defendant had prior notice of the victim's health, and held that sufficient evidence supported the conclusion that the defendant "assaulted the deceased, in violation of Section 2901.25, Revised Code, and that such assault proximately caused the death of the deceased." *Id.* at 20.

{¶88} In the case sub judice, the statute contemplates a

proximate cause theory and the trial court correctly instructed the jury on causation as follows: "Cause is an essential element of the offense of felonious assault. Cause is an act which directly produces the serious physical harm and without which it would not have occurred," and the jury characterized Sharpe's death as a reasonably foreseeable consequence of the events appellant set into motion on June 13, 2021.

{¶89} After our review of the probative evidence, along with the inferences reasonably drawn therefrom in a light most favorable to the prosecution, we believe that appellee adduced sufficient evidence, if believed, to prove each element of the offense and support appellant's felony murder conviction. Consequently, we overrule appellant's third assignment of error.

IV.

{¶90} In his fourth assignment of error, appellant asserts that the weight of the evidence did not support beyond a reasonable doubt that appellant's assault proximately caused the victim's felony murder. Specifically, appellant contends that because appellee failed to prove that appellant knew about the victim's severe heart condition and intoxication, the weight of the evidence did not support his felony murder conviction. Appellee asserts that the beating appellant gave the victim is

not required to be the exclusive cause of death, only that the victim dies as a "proximate result" of the beating.

{¶91} After a court of appeals determines that sufficient evidence supports a trial court's judgment, that court may nevertheless conclude that a judgment is against the weight of the evidence. *Dunn*, *supra,* 2017-Ohio-518 at ¶ 15; *Wickersham*, *supra,* 2015-Ohio-2756 at ¶ 24; *Thompkins, supra,* 78 Ohio St.3d 387. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " *Wickersham* at ¶ 24, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶92} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the

evidence, and consider witness credibility. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). However, the reviewing court must remember that credibility generally is an issue for the trier of fact to resolve. *State v. Schroeder,* 2019-Ohio-4136, ¶ 61 (4th Dist.*; Dunn* at ¶ 16; *Wickersham* at ¶ 25. Because the trier of fact sees and hears the witnesses, an appellate court will afford substantial deference to a trier of fact's credibility determinations. *Schroeder* at ¶ 62. The jury has the benefit of seeing witnesses testify, observing facial expressions and body language, hearing voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). An appellate court may reverse a conviction if the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *State v. Benge*, 2021-Ohio-152, ¶ 28 (4th Dist.).

**{¶93}** Again, murder is defined in this particular case as: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.02(B). Appellant contends

that, because appellee failed to prove that he knew about the victim's severe heart condition and intoxication, his murder conviction is against the manifest weight of the evidence. However, as appellee points out, the forensic pathologist testified that (1) the victim received nine distinct injuries to his head, (2) the cause of death was blunt force trauma to the head, and (3) but for the blunt force trauma, the contributing factors would not have led to the victim's death that day. Moreover, appellee adduced testimony from the victim's daughter that, after appellant beat the victim, he stopped at the victim's daughter's home and told her, "he just beat the pulp out of [her] Dad," appellee told Detective Fick, "So I just went over to Blaine Sharpe's house and I beat the living f*ck out of that guy," and "I went there and I hit him several times... punched him in the face three times... went to the house right beside him and I said Courtney, which is his daughter. I said Courtney, your dad f*cked me out of a lot of money and I hurt him on his porch." Finally, appellant stated in a recorded jail call to his mother, "I lost it, no f*cking way, I don't know, inner demon, I'll have to pay for it the rest of my life."

{¶94} After we consider all the evidence adduced at trial, we believe that a rational jury could have considered this

evidence and found, beyond a reasonable doubt, that appellant's felonious assault proximately caused Sharpe's death, notwithstanding other medical conditions or factors. Consequently, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice. Thus, in the case sub judice we conclude that appellee presented ample, competent credible evidence that appellant caused the victim's death as a proximate result of his assault.

{¶95} Therefore, we conclude that appellant's murder conviction is not against the manifest weight of the evidence and we overrule appellant's fourth assignment of error.

V.

{¶96} In his fifth assignment of error, appellant asserts that the weight of the evidence did not support his murder conviction on the issue of self-defense. In particular, appellant argues that, although the trial court properly instructed the jury that appellee has the burden to disprove self-defense beyond a reasonable doubt, the jury lost its way in rejecting self-defense. Appellant claims that his testimony "covered every element of self defense," and asserts that he testified that he went to the victim's home to merely "talk with him," but Sharpe "came out and grabbed him around the neck," and

appellant "punched him a couple of times to get him off." Appellant contends that he was not at fault in creating the situation "because Blaine jumped him," and that "no evidence undermined [his] testimony."

{¶97} However, as appellee observes, appellant is the only witness who supported the self-defense claim. Further, appellee asserts that a "reviewing court is not required to accept as true the incredible; whether the evidence is uncontradicted; whether a witness was impeached; what was not proved; the certainty of the evidence; the reliability of the evidence; whether a witness' testimony is self-serving; whether the evidence is vague, uncertain, conflicting or fragmentary." *State v. Mattison*, 23 Ohio App.3d 10 (1985).

{¶98} In the case at bar, the jury chose to disbelieve appellant's testimony that he did not intend to harm the 59-year-old victim and that he acted only in self-defense. However, as appellee points out, appellant's statements on recorded jail calls contradict appellant's own testimony and his theory of self-defense. Appellant stated on one call to his mother, "I was just going there to punch him in the . . . mouth." He also described his actions to law enforcement as "hammer fist" blows to the victim's head.

{¶99} Thus, after we consider all the evidence adduced at trial, we believe that a rational jury could have rejected appellant's self-defense theory. As noted above, appellee presented ample, competent credible evidence that appellant caused the victim's death as a proximate result of his assault.

{¶100} Consequently, based upon the foregoing reasons we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice. Thus, we overrule appellant's fifth assignment of error.

VI.

{¶101} In his final assignment of error, appellant asserts that the weight of the evidence did not support his felonious assault of Heather Irwin. Specifically, appellant contends that regardless of the statutory element, (1) the only evidence appellee adduced to support this felonious assault count included Irwin's testimony, (2) Irwin "had been drinking vodka and smoking marijuana," and (3) other witness testimony contradicted Irwin's story.

{¶102} As noted above, in light of the evidence analysis this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence,

the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Benge, supra,* at ¶ 28.

{¶103} In the case sub judice, while appellant attempted to minimize his actions towards Heather Irwin, Irwin testified that (1) she overheard appellant say "something about avenging [Nia's] father," (2) appellant returned to her camper, grabbed Nia's hair, "drag[ged] her and punch[ed]her," (3) appellant beat Nia and ripped at her clothes, and (4) when Irwin attempted to protect Nia, appellant beat Irwin in the head several times with her baseball bat. In addition, witness Mary Robinson testified about the condition in which she found Irwin and Nia, and Robinson testified that she required five stitches after the attack.

{¶104} Generally, the trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 2007-Ohio-2202, ¶ 24. The jury may note inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964); *State v.*

*Nicholson,* 2022-Ohio-374, ¶ 47 (8th Dist.); *State v. Helton*, 2019-Ohio-4399, ¶ 22 (12th Dist.) ("[t]he jury was free to believe or disbelieve all, part, or none of the testimony elicited from the state's witnesses in support of each offense"); *State v. Harner*, 2020-Ohio-1184, ¶ 23 (12th Dist.)("[t]he jury, as the trier of fact, was free to believe all, part, or none of [the] testimony of each witness").

{¶105} By virtue of its verdict, the jury apparently chose to believe Irwin's testimony and discredit appellant's testimony. This determination is well within the jury's purview as the trier of fact and ultimate fact finder. *See State v. Graffius*, 2019-Ohio-4961, ¶ 11 (7th Dist.) ("[t]he jury was free to believe either version of the facts and, based on [a]ppellant's conviction, apparently believed the victim").

{¶106} Consequently, after we consider all the evidence, we believe that a rational jury could have rejected appellant's testimony and believed the testimony concerning Heather Irwin's injury. As noted above, appellee presented ample, competent credible evidence that appellant feloniously assaulted Irwin. Consequently, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice.

{¶107} Accordingly, for all of the foregoing reasons, we

overrule appellant's final assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

[Cite as *State v. Pennington*, 2024-Ohio-5681.]

JUDGMENT ENTRY

It is ordered that the judgment be affirmed. Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                              Peter B. Abele, Judge

NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal

commences from the date of filing with the clerk.